James GAMES, Defendant–Appellant,

v.

STATE of Indiana, Plaintiff–Appellee.

No. 49S00–9002–PD–114.

Supreme Court of Indiana.

July 22, 1997.

Rehearing Granted Dec. 23, 1997.

**468**

Susan K. Carpenter, Public Defender, J. Michael Sauer, Marie F. Donnelly, Deputy Public Defenders, for Defendant–Appellant.

Pamela Carter, Attorney General, Arthur Thaddeus Perry, Deputy Attorney General, for Plaintiff–Appellee.

DICKSON, Justice.

The defendant, James Games, appeals from a judgment granting and denying post-conviction relief following his convictions for the 1983 murder of Thomas Ferree, Robbery, Conspiracy to Commit Battery, and Conspiracy to Commit Robbery. The defendant was sentenced to death for Murder and forty years on the other three counts. The convictions and sentences were affirmed on direct appeal. *Games v. State,* 535 N.E.2d 530 (Ind.1989), *cert. denied,* 493 U.S. 874, 110 S.Ct. 205, 107 L.Ed.2d 158.

Upon the defendant's petition for post-conviction relief, the post-conviction court upheld the Murder, Robbery, and Conspiracy convictions, but reversed the defendant's death sentence and remanded the case to the trial court for a new penalty phase trial, finding that the performance of trial counsel at the original penalty phase was ineffective. The defendant now appeals from the denial of post-conviction relief as to the convictions.

The State does not appeal from the grant of post-conviction relief regarding the penalty phase proceeding.

Appealing from the partial denial of his petition for post-conviction relief, the defendant-petitioner raises five allegations of error: (1) ineffective assistance of trial counsel at the guilt phase; (2) the State's failure to disclose materially favorable evidence; (3) ineffective assistance of appellate counsel; (4) ineffective assistance of counsel due to systemic defects in the Marion County Superior Court indigent defense system; and (5) violation of the constitutional prohibitions against double jeopardy. We affirm the post-conviction court in part and reverse in part.

### 1. Ineffective Assistance of Trial Counsel at the Guilt Phase

The defendant contends that he received inadequate trial representation from his attorney in violation of the Sixth and Fourteenth Amendments to the United States Constitution. To prevail with an ineffective assistance of counsel claim, the defendant must show that counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the Sixth Amendment and that this deficient performance prejudiced the defendant. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Lloyd v. State,* 669 N.E.2d 980, 984 (Ind.1996).

The defendant offers numerous instances of alleged deficient performance by his attorney. However, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069, 80 L.Ed.2d at 699. Stating, "[t]he object of an ineffectiveness claim is not to grade counsel's performance," the Court instructed that, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.*

We recently have addressed the requirements necessary to establish prejudice when a defendant challenges his guilty plea

on the grounds of ineffective assistance of counsel. *See State v. Van Cleave*, 674 N.E.2d 1293 (Ind.1996) (holding that, to establish prejudice, the defendant must show a reasonable probability that he would not have been convicted at trial). The Court in *Strickland* held that "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695, 104 S.Ct. at 2068–69, 80 L.Ed.2d at 698. As we noted in *Van Cleave*, while the *Strickland* Court initially stated that a reasonable probability is a probability sufficient to undermine confidence in the outcome, rendering the verdict unreliable, the Court's recent decision in *Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), has elaborated upon this definition. Placing emphasis on whether the "result of the proceeding was fundamentally unfair or unreliable," the *Fretwell* Court stated that setting aside a conviction "solely because the outcome would have been different but for counsel's errors may grant the defendant a windfall to which the law does not entitle him." *Id.* at 369–70, 113 S.Ct. at 842–43, 122 L.Ed.2d at 189. Thus, a different outcome but for counsel's error will not constitute prejudice if the ultimate result reached was fair and reliable.

■ Complicating the ineffective assistance of counsel analysis in this case is the fact that the defendant is appealing the denial of his petition for post-conviction relief, a negative judgment. Thus, the defendant must convince this Court that the evidence presented during the post-conviction proceeding is without conflict and, as a whole, leads unerringly and unmistakably to a decision opposite that reached by the post-con-

viction court. *Spranger v. State*, 650 N.E.2d 1117, 1119 (Ind.1995). The defendant's claim in post-conviction proceedings—that he received constitutionally inadequate assistance of trial counsel—required that he prove, among other things, that the ultimate result (his convictions) was fundamentally unfair or unreliable. In his post-conviction case, the defendant's prejudice claim was that, but for counsel's deficient performance, the defendant would not have been convicted of murder, but rather a lesser-included offense: voluntary manslaughter, involuntary manslaughter or reckless homicide. However, in this appeal from the post-conviction court's negative finding, the proper inquiry is not simply whether "but for counsel's mistakes" the outcome would have been different. The defendant must convince this Court that there is no evidence presented which supported a murder conviction [1] and that, as a whole, the evidence leads unerringly and unmistakably to a decision that his conviction for murder was unfair and unreliable. We find that the defendant has failed to carry this burden.

■ When evaluating the defendant's claim of prejudice, we are mindful that, "a court hearing an ineffectiveness claim must consider the totality of the evidence" in making this determination. *Strickland*, 466 U.S. at 695, 104 S.Ct. at 2069, 80 L.Ed.2d at 698. The totality of the evidence illustrates that there was sufficient, indeed overwhelming,[2] evidence presented supporting a fair and reliable conviction for murder.

The evidence presented to the post-conviction court included the following. At trial, codefendant Tillberry, who pled guilty to Ferree's murder, testified that he and the defendant decided to steal a stereo from the

---

1. The defendant contends that he has been prejudiced because he would have been convicted of a lesser-included offense, not murder. Under *Spranger*, the evidence supporting the defendant's contention must be without conflict. Thus, the defendant must establish that the evidence points unerringly to a conviction for voluntary manslaughter, involuntary manslaughter, or reckless homicide and that there was no evidence presented supporting a murder conviction.

2. The post-conviction court, finding no prejudice, concluded that the "State's evidence was overwhelming as to the guilt of [the defendant]."

P.C.R. Record at 673. The defendant contends that this "overwhelming evidence" ·was based only on the uncorroborated testimony of his co-defendant, who pled guilty to murder and was sentenced to fifty-five years in exchange for agreeing to testify at the defendant's trial. Challenging the post-conviction court's conclusion, the defendant argues that "uncorroborated testimony ... cannot reasonably be characterized as 'overwhelming.'" Brief of Appellant at 35. However, as is discussed *infra*, Tillberry's testimony is not uncorroborated.

victim, a former acquaintance of the defendant. The defendant phoned the victim and arranged to have him pick them up, the victim apparently expecting homosexual favors from the boys. After arriving at the victim's house, the defendant took a shower, leaving Tillberry alone with the victim. Following the defendant's return, the victim left the room and Tillberry told the defendant that the victim was making passes at him. The defendant suggested that Tillberry stab the victim as they were walking up the stairs to take a shower. Tillberry did this, stabbing the victim in the back with a wooden handled, lock-blade folding knife. The victim yelled out the defendant's name, stating that he was going to get the defendant and started down the stairs. Tillberry testified that he then ran past the victim, went across the room, and looked back to see the victim lying on the floor. He testified that the defendant then pulled Tillberry's knife out of the victim's back and started stabbing the victim with the knife again. The defendant and the victim fought with each other and the defendant asked Tillberry to "get him something else." Record at 814. Tillberry testified that he gave the wrought iron fireplace poker to the defendant, who used it on the victim. The defendant again asked Tillberry to get him something else and Tillberry went into the kitchen, retrieved a kitchen knife and a meat cleaver, and gave it to the defendant. At this point, the victim had stopped moving. The defendant then went into the kitchen himself, retrieved several more knives and resumed stabbing the victim. As they were leaving, Tillberry threw a knife at the victim, which hit the victim's shoulder and remained there. The defendant and Tillberry then stole the victim's car and left.

Tillberry's testimony is corroborated by the evidence collected at the scene. The pathologist who completed the autopsy on the decedent, John Baenziger, M.D., testified that the victim died as the cumulative result of twenty-two stab wounds to the head, neck, chest, back, extremities, and abdomen and severe blunt force trauma and fractures to the skull and face. The crime scene field technician, Ed Charters, a sergeant with the Indiana State Police, collected the following weapons from the residence: two yellow handled knives, two silver handled kitchen knives, a wooden handled folding knife, a wooden handled kitchen knife, a meat cleaver, a wrought iron fireplace poker, and a nondescript kitchen knife. He also collected dried blood samples from the walls in the residence and from the kitchen. Forensic serologist James Romack analyzed the dried blood on the weapons and the blood samples collected by Sergeant Charters. He found blood consistent with the defendant's blood type on both of the yellow handled knives, the wooden handled folding knife, the wooden handled kitchen knife, one of the silver handled kitchen knives, the wrought iron fireplace poker, and the nondescript kitchen knife. He also found that ten of the fourteen blood samples taken from the walls of the residence contained blood consistent with the defendant's blood type. In contrast, Tillberry's blood type was inconsistent with every blood sample taken from the walls of the residence. Tillberry's blood type was also inconsistent with blood found on all of the weapons, except the wooden handled folding kitchen knife—which Tillberry admitted using to stab the victim on the stairs—and the fireplace poker.[3]

Additionally, Barbara Duke, a friend of the defendant, testified that prior to the victim's murder she overhead the defendant and Tillberry talking about stealing a stereo from someone. Michael Cherry, also a friend of the defendant, testified that, soon after the victim was killed, the defendant stated that he had gone to the victim's house to "rip the [stuff] off," and that the defendant boasted had he "killed a [expletive deleted] tonight," using "a knife . . . a fire poker" and a "meat cleaver." Record at 938, 940, 941.

We agree with the post-conviction court in its conclusion that the Murder conviction evidence is overwhelming. The defendant has failed to demonstrate the absence of evidence supporting a murder conviction. We do not believe his conviction for murder to be unfair

---

3. The victim's blood type was consistent with blood found on one of the yellow handled knives, the wooden handled folding knife, the wooden handled kitchen knife, the meat cleaver, the other silver handled kitchen knife, and the wrought iron fireplace poker.

or unreliable. The defendant has not shown he was prejudiced by any alleged deficiencies in his counsel's performance and his claim of ineffective assistance must fail.

### 2. Failure to Disclose Materially Favorable Evidence

■ The defendant contends that his due process rights were violated by the prosecution's failure to disclose materially favorable impeachment evidence, specifically: (1) evidence that Tillberry's blue jeans were soaked with the victim's blood; and (2) that Tillberry had admitted to hitting the victim with a meat cleaver.

The defendant bases his allegation as to the suppression of Tillberry's jeans on his trial counsel's testimony that the first time he recalled seeing this information was the week before the post-conviction proceedings and that, at trial, he was not aware that Tillberry's jeans were soaked in the victim's blood. We first note that, contrary to the defendant's conclusion, this testimony does not prove the State *suppressed* such evidence.

The defendant claims that the "page of the report that contained this information was not provided to defense counsel prior to trial." Brief of Appellant at 39. The "report" referenced by this claim is actually the combination of two reports: (1) the Marion County Sheriff's Department "Homicide Investigation Report," dated July 15, 1983, wherein the description and condition of Tillberry's clothing was identified as "blue jeans—blood soaked." P.C.R. Record at 969; and (2) the Indiana State Police forensic serologist's "Report of Laboratory Examination" which chronicles the analysis of over three hundred items collected during the State Police investigation, items which are listed on the "Indiana State Police Property Record and Receipt," dated August 18, 1983.

Contrary to the defendant's allegation, the trial record demonstrates that defense counsel cross-examined the forensic serologist upon these very reports and that, throughout his cross-examination, defense counsel specifically referred to the portions the defendant claims the State suppressed. Record at 739–743.

Furthermore, the defendant has offered no testimony from the forensic serologist, or any other witness, supporting the defendant's implication that it was Tillberry's jeans which contained blood consistent with the victim's blood type. Our review of these reports shows that the "Indiana State Police Property Record and Receipt" of items combines the property of Tillberry *and* the defendant and identifies three separate bags—numbered 83, 84, and 87—as each containing blue jeans of some sort. This report *does not designate* which blue jeans belonged to whom.[4] Blood consistent with the victim's blood type was found on item 84. While dried blood was found on item number 87, an "insufficient amount and/ or concentration existed for pheno-typing." P.C.R. Record at 2279. Item number 83 failed to demonstrate any blood. Absent proof that the jeans which contained the victim's blood were actually Tillberry's, there is no support for the defendant's conclusion that such evidence even existed. For all of the above reasons, the defendant has not established that the State failed to disclose materially favorable evidence.

■ The defendant's second claim is that the State suppressed an interview of Taylor James Baptista, in which Baptista stated that Tillberry admitted that he had hit the victim twice with a meat cleaver.[5] The defendant must convince this Court that the evidence presented during the post-conviction proceeding is without conflict and, as a whole, leads unerringly and unmistakably to a deci-

---

4. While the Marion County Sheriff's Department "Homicide Investigation Report," does not list any clothing as having been recovered from the defendant at the time of his arrest, we note that the "Indiana State Police Property Record and Receipt," dated over a month after the arrest, identifies over 300 items it collected during the subsequent investigation and includes three separate blue jean items.

5. The State claimed this evidence was work product and therefore not subject to discovery. This evidence was disclosed to the defendant only after the post-conviction court ordered the State to do so.

sion opposite that reached by the post-conviction court. *Williams v. State*, 525 N.E.2d 1238, 1239 (Ind.1988).

To succeed in a claim that the suppression of impeachment evidence by the prosecution violates an accused's rights to due process, the defense must show, among other things, that the suppressed evidence was material either to guilt or to punishment. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215, 218 (1963); *Bellmore v. State*, 602 N.E.2d 111, 119 (Ind. 1992). Such evidence is considered to satisfy this requirement only if, based on the totality of the circumstances, there is a reasonable probability that withholding such impeachment evidence resulted in the defendant not receiving a fair trial, thereby undermining confidence in the trial's outcome. *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490, 506 (1995); *United States v. Bagley*, 473 U.S. 667, 678, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481, 491 (1985). The post-conviction court found that, "assuming *arguendo* that the State failed to provide the discovery requested ... it would not have made a difference in the outcome because of the other overwhelming evidence of guilt...." Record at 703.

We find that the failure of the State to give the defendant this impeachment evidence does not undermine confidence in the trial's outcome. As we concluded in the previous section regarding ineffective assistance of counsel, the evidence against the defendant was overwhelming. In addition, during cross-examination Tillberry was confronted with several instances in which he had made prior inconsistent statements—that he had committed the killing in self-defense, that he had planned on stabbing the victim before he entered the house, that what he had told a friend's mother about the events of the evening was different than what had really happened—and he admitted on the stand, each time, that he had lied. Notwithstanding these multiple admissions that he had previously lied, the jury still found his trial testimony credible, as evidenced by its verdict.

We conclude that, in light of the independent corroborating evidence supporting the defendant's murder conviction and the fact that substantial impeachment evidence was introduced against Tillberry, the alleged withholding of the additional impeachment evidence from Baptista [6] did not result in an unfair trial. Confidence in the trial's outcome is not undermined and the evidence does not lead unerringly and unmistakably to a decision opposite that reached by the post-conviction court. We therefore reject the defendant's claim on this issue.

### 3. Ineffective Assistance of Appellate Counsel

■ The defendant argues that counsel for his direct appeal was ineffective for failing to raise three claims on direct appeal: (1) ineffective assistance of trial counsel; (2) prosecutorial misconduct; and (3) double jeopardy violations. The standard of review for ineffective assistance of appellate counsel is the same as that utilized for ineffective assistance of trial counsel. *Lowery v. State*, 640 N.E.2d 1031, 1048 (Ind.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 525, 133 L.Ed.2d 432 (1995).

The defendant first claims that he was deprived of effective assistance of appellate counsel by appellate counsel's failure to assert the ineffective assistance of trial counsel. Because we have held that the defendant failed to establish that trial counsel was ineffective, appellate counsel did not err in not raising such a claim.

■ The second allegation of ineffective assistance of appellant counsel arises from counsel's failure to raise a claim of prosecutorial misconduct based on the State's closing argument. Because no objection was raised at trial, the defendant's burden on appeal would have been to establish that such statements rose to the level of fundamental error. *See Lloyd v. State*, 669 N.E.2d 980, 984 (Ind. 1996). It is important to recognize that not all errors are fundamental errors:

To qualify as 'fundamental error,' the error must be a substantial blatant violation of

---

**6.** We also note that the defendant's trial counsel testified that Baptista "was vulnerable to impeachment" himself. P.C.R. Record at 3465–66.

· basic principles rendering the trial unfair to the defendant.... The element of harm is not shown by the fact that a defendant was ultimately convicted; rather, it depends upon whether his right to a fair trial was detrimentally affected.... The requisite analysis for fundamental error considers the element of harm, and whether the resulting harm is substantial. *David v. State*, 669 N.E.2d 390, 392 (Ind. 1996) (quoting *Townsend v. State*, 632 N.E.2d 727, 730 (Ind.1994)).

The post-conviction court concluded that, "although minor errors were committed during the guilt phase, the evidence overwhelmingly pointed to the guilt of [the defendant].... [N]one of the alleged errors ... rise to the level of fundamental error." P.C.R. Record at 696. Having previously noted the overwhelming evidence of guilt, we are not persuaded that the evidence leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court. The failure of appellate counsel to raise "minor errors" did not detrimentally affect the defendant's right to a fair appeal.

The defendant's final contention is that the trial court violated the double jeopardy prohibitions of the Fifth and Fourteenth Amendments to the United States Constitution and Article 1, Section 14 of the Indiana Constitution.[7] He argues that the prohibitions

against double jeopardy were violated by: (1) sentencing the defendant for both Murder and Robbery; (2) sentencing the defendant for both Murder and Class A felony Robbery; and (3) convicting and sentencing the defendant for both Conspiracy to Commit Battery and Conspiracy to Commit Robbery. He presents this error to us claiming that appellate counsel was "ineffective for failing to raise [double jeopardy violations] on direct appeal." Brief of Appellant at 52.

As we have noted in section one, *supra*, to succeed in establishing prejudice the defendant must demonstrate not only that there would have been a different outcome but for counsel's error, but also that the evidence presented leads unerringly and unmistakably to a decision that the ultimate result (upholding his convictions) was unfair and unreliable. We find that, with respect to the claim involving his sentences for both Murder and Robbery/ Murder and Class A felony Robbery, the defendant has failed to carry his burden and, therefore, his claim fails.

The Double Jeopardy Clause protects against successive prosecutions following conviction, reprosecution after acquittal, and multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). The defendant bases his first and second

7. In presenting the general claim that his sentences violate the double jeopardy provisions of the Indiana and United States Constitutions, the defendant cites both constitutions. However, the defendant does not provide Indiana authority, and we find none from this Court, establishing an independent state double jeopardy protection based upon an analysis of the Indiana Constitution. Of the cases cited by the defendant in support of his double jeopardy argument, only *Bevill v. State*, 472 N.E.2d 1247 (Ind. 1985) mentions the Indiana Constitution. However, the mention in *Bevill* is only a recitation of *the defendant's* claim that it violated the Indiana Constitution. *Bevill* resolves the claim utilizing an analysis based upon the federal provision. The defendant presents no argument urging that the Indiana Constitution provides double jeopardy protections different from those under the federal constitution. *Cf. Peterson v. State*, 674 N.E.2d 528, 533 (Ind.1996) ("Separate and apart from the federal Fourth Amendment analysis, Article I, Section 11 of the Indiana Constitution provides an independent prohibition against unreasonable searches."); *Price v. State*,

622 N.E.2d 954, 958 (Ind.1993) ("[Federal] First Amendment jurisprudence differs from the Indiana approach [under Indiana's free speech clause]"); *Collins v. Day*, 644 N.E.2d 72, 75 (Ind.1994) (Article 1, Section 23 of the Indiana Constitution "should be given independent interpretation and application."); *Moran v. State*, 644 N.E.2d 536, 540 (Ind.1994) (Article 1, Section 11's application of an independent reasonableness standard rather than the federal Fourth Amendment jurisprudence); *Brady v. State*, 575 N.E.2d 981, 987 (Ind.1991) (Article 1, Section 13 is treated differently than the federal Sixth Amendment because "it has a special concreteness and is more detailed."). Because the defendant fails to present an argument based upon a *separate analysis* of the Indiana Constitution, "we will only analyze this under federal double jeopardy standards." *Gregory–Bey v. State*, 669 N.E.2d 154, 157 n. 8 (Ind.1996). *See also Bivins v. State*, 642 N.E.2d 928, 949 n. 7 (Ind. 1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 783, 133 L.Ed.2d 734 (1996); *St. John v. State*, 523 N.E.2d 1353, 1355 (Ind.1988).

double jeopardy contentions on the third protection, contending he received multiple punishments—sentences for murder and robbery—for what he alleges was the same offense. As support for this argument, the defendant does not cite the statutory elements involved. Instead, he cites the manner in which the offenses were charged, stating that "the Murder *as charged* was the 'force' allegedly employed in the commission of the Robbery *as charged*." Brief of Appellant at 53 (emphasis added).[8] We hold today that this Court's previous interpretation of the federal Double Jeopardy Clause—which looked beyond the statutory elements, adding the requirement that a reviewing court look to the offenses as charged or to the jury instructions outlining the elements of the crimes—does not comport with federal jurisprudence. Consequently, the defendant has not demonstrated that there would have been a different outcome had counsel raised this issue on appeal, nor that the evidence presented leads unerringly and unmistakably to a decision that the ultimate result (upholding his convictions) was unfair and unreliable.

 The United States Supreme Court has repeatedly recognized that, while the Double Jeopardy Clause does protect against multiple punishments, the primary purpose of the Double Jeopardy Clause is to protect against multiple trials. *Missouri v. Hunter,* 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983); *Whalen v. United States,* 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980); *Albernaz v. United States,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981). In the context of multiple punishments imposed in a single criminal proceeding, the Court has declared that the sole purpose of the Double Jeopardy Clause is to ensure that a court imposes no more punishment on a defendant than the legislature intended. *See Hunter; Brown v. Ohio,* 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187, 194 (1977) ("Where consecutive sentences are imposed at a single criminal trial, the role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authority by imposing multiple punishments for the same offense."). Whether multiple punishments may be imposed against a defendant in a single proceeding is, thus, solely a matter of legislative intent. *Iannelli v. United States,* 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975). While the legislature "ordinarily does not intend to punish the same offense under two different statutes," *Whalen,* 445 U.S. at 692, 100 S.Ct. at 1438, 63 L.Ed.2d at 724, the legislature is constitutionally permitted to do so, as long as the intent of the legislature is clear.[9] *Hunter; Whalen; Albernaz.* Where legislative intent is clear that multiple punishment is intended, double jeopardy is not violated and further inquiry into the statutory elements is not appropriate. *See Albernaz,* 450 U.S. at 340, 101 S.Ct. at 1143, 67 L.Ed.2d at 282 (with clear legislative intent, whether or not the *Blockburger* statutory

---

**8.** Specifically, the defendant cites two Indiana cases requiring a reviewing court to look at the manner in which the offenses were charged: *Tawney v. State,* 439 N.E.2d 582 (Ind.1982) and *Tingle v. State,* 632 N.E.2d 345 (Ind.1994). The defendant then quotes from the charging information and contends that:

> The "force" element of the charged Robbery was "while armed with deadly weapons, to wit: knives and a cleaver ... using force which resulted in serious bodily injury to Thomas H. Ferree, to wit: death." ... This was the same act as alleged in the murder information ("did ... kill ... by cutting and stabbing ... with knives and a cleaver, thereby inflicting mortal lacerations and stab wounds ... causing said Thomas H. Ferree to die").

Brief of Appellant at 53.

**9.** For example, the defendant in *Missouri v. Hunter* was convicted of first degree (armed) robbery and "armed criminal action." When

enacting the "armed criminal action" statute, the Missouri legislature specifically provided that "[t]he punishment imposed pursuant to this subsection shall be in addition to any punishment provided by law...." Mo.Rev.Stat. § 559.225. The Supreme Court held that, on the face of the statutes, the two prosecutions did not violate the Double Jeopardy Clause:

> [S]imply because two criminal statutes may be construed to proscribe the same conduct under the *Blockburger* test does not mean that the Double Jeopardy Clause precludes the imposition, in a single trial, of cumulative punishments pursuant to those statutes. The rule of statutory construction noted in *Whalen* is not a constitutional rule requiring courts to negate clearly expressed legislative intent.

*Hunter,* 459 U.S. at 368, 103 S.Ct. at 679, 74 L.Ed.2d at 543–44.

element test is satisfied is irrelevant: "[t]he *Blockburger* test is a 'rule of statutory construction,' and because it serves as a means of discerning congressional purpose [it] should not be controlling where, for example, there is a clear indication of contrary legislative intent"). It is only when legislative intent to impose multiple punishments is uncertain that further inquiry is required.

This further inquiry, known as the "same elements" test, determines whether or not a legislature intended to impose separate punishments for multiple offenses arising in the course of a single act or transaction:

> The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not.

*Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306, 309 (1932). *See also Iannelli*, 420 U.S. at 785 n. 17, 95 S.Ct. at 1293 n. 17, 43 L.Ed.2d at 627 n. 17 ("The test articulated in *Blockburger* ... serves a generally similar function of identifying [legislative] intent to impose separate sanctions for multiple offenses arising in the course of a single act or transaction."). If *Blockburger* is satisfied, the court assumes that the statutes are not punishing the same offense and multiple punishment is constitutionally permitted.[10] If the test is not satisfied, double jeopardy is violated.

A textual analysis of the "same elements" test demonstrates that *Blockburger* requires a comparison of the statutory elements. "[W]here the same act or transaction constitutes a violation of two distinct *statutory provisions*, the test to be applied ... is whether each *provision* requires proof of an additional fact which the other does not." *Blockburger*, 284 U.S. at 304, 52 S.Ct. at 182, 76 L.Ed. at 309 (emphasis added). The latter "provision" is in direct reference to the former "provision," which, in turn, specifically references the statutory elements. This conclusion is further supported by the fact that the *Blockburger* Court relied upon and quoted from two earlier double jeopardy decisions requiring that:

> The test is not whether the defendant has already been tried for the same act, but whether he has been put in jeopardy for the same offense. A single act may be an offense against two *statutes* ... if each *statute* requires proof of an additional fact which the other does not....

*Blockburger*, 284 U.S. at 304, 52 S.Ct. at 182, 76 L.Ed. at 309 (quoting *Gavieres v. United States*, 220 U.S. 338, 342, 31 S.Ct. 421, 422, 55 L.Ed. 489, 490 (1911) and *Morey v. Commonwealth*, 108 Mass. 433, 434 (1871)) (emphasis added).

More recently, the Court, in *Illinois v. Vitale*, 447 U.S. 410, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980), stated:

> [T]he *Blockburger* test focuses on the proof necessary to prove the statutory ele-

---

**10.** The defendant in *Blockburger* was convicted under one provision of the Harrison Narcotics Act of two counts of selling an illegally packaged drug on two separate days to a single individual and, under a different provision, was convicted of failing to make his sales pursuant to written order. He claimed this violated double jeopardy, as he could not be convicted for the same sale under two different provisions and that his two sales to a single individual constituted a single offense. In rejecting this argument, the Supreme Court held that the charges were not for the same offenses, because, under the statute in question, each "sale constitutes a distinct offense, however closely they may follow each other." *Blockburger*, 284 U.S. at 302, 52 S.Ct. at 181, 76 L.Ed. at 309. As far back as *Ebeling v. Morgan*, 237 U.S. 625, 35 S.Ct. 710, 59 L.Ed. 1151 (1915), the Court rejected the argument that a defendant could not be charged with multiple counts stemming from one transaction.

Each count in *Ebeling* involved damage to a separate United States mail bag, arising from a single vandalism spree. The Court said this did not violate double jeopardy, as statutory interpretation revealed that "it was the intention of the lawmakers to protect each and every mail bag from felonious injury and mutilation." *Id.* at 629, 35 S.Ct. at 711, 59 L.Ed. at 1152. Similarly, the Court in *Morgan v. Devine*, 237 U.S. 632, 35 S.Ct. 712, 59 L.Ed. 1153 (1915), held that a defendant could be convicted and sentenced for both breaking into a post office and stealing property belonging to the Post Office Department, stating that "the test is not whether the criminal intent is one and the same inspiring the whole transaction, but whether separate acts have been committed with the requisite criminal intent and are such made punishable by [statute]." *Id.* at 640, 35 S.Ct. at 714, 59 L.Ed. at 1156.

ments, rather than on the actual evidence to be presented at trial. Thus we stated that if "each *statute* requires proof of an additional fact which the other does not," the offenses are not the same under the *Blockburger* test.

*Id.* at 416, 100 S.Ct. at 2265, 65 L.Ed.2d at 235 (emphasis in original) (citation omitted). Similarly:

> As *Blockburger* and other decisions applying its principle reveal, the Court's application of the test focuses on the *statutory elements* of the offense. If each requires proof of a fact that the other does not, the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes.

*Iannelli*, 420 U.S. at 785 n. 17, 95 S.Ct. at 1294 n. 17, 43 L.Ed.2d at 627 n. 17 (emphasis added) (citations omitted).

The most recent double jeopardy decisions from the Supreme Court provide additional guidance as to the proper analysis of double jeopardy claims based on multiple punishments. A majority of the Court in *United States v. Dixon*, 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993), agreed that, in the context of multiple punishments, the focus was solely on the statutory elements of the offenses.[11] Chief Justice Rehnquist, joined by Justices O'Connor and Thomas, stated, "Our double jeopardy cases applying *Blockburger* have focused on the statutory elements of the offenses charged, not on the

facts that must be proven under the particular indictment at issue. . . ." *Dixon*, 509 U.S. at 716–17, 113 S.Ct. at 2867, 125 L.Ed.2d at 581 (Rehnquist, C.J., concurring in part and dissenting in part). Justice White stated, "To focus on the *statutory elements of a crime* makes sense where cumulative punishment is at stake, for there the aim simply is to uncover legislative intent. The *Blockburger* inquiry, accordingly, serves as a means to determine this intent." *Dixon*, 509 U.S. at 735, 113 S.Ct. at 2881–82, 125 L.Ed.2d at 593 (White, J., concurring in part and dissenting in part) (emphasis added). Similarly, Justice Souter, joined by Justice Stevens, stated:

> Courts enforcing the federal guarantee against multiple punishment therefore must examine the various offenses for which a person is being punished to determine whether, *as defined by the legislature,* any two or more of them are the same offense. . . . Indeed the determination whether *two statutes* describe the "same offence" for multiple punishment purposes has been held to involve only a question of *statutory* construction. We ask what the elements of each offense are as a matter of *statutory* interpretation, to determine whether the *legislature* intended "to impose separate sanctions for multiple offenses arising in the course of a single act or transaction."

*Dixon*, 509 U.S. at 745, 113 S.Ct. at 2881–82, 125 L.Ed.2d at 599–600 (Souter, J., concurring in part and dissenting in part) (emphasis

---

**11.** While not at issue in the case at bar, we recognize that *Dixon* involved successive prosecutions and that there were differing opinions as to whether *Blockburger* is the *only* test for successive prosecutions. Justices Souter, White, Stevens and Blackmun believe that, in successive prosecution cases, a separate analysis in addition to *Blockburger* is required. In particular, the four Justices would not overrule *Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), which added a "second prong" to the *Blockburger* test requiring a court to consider whether the *conduct* underlying the offenses was the same, thus violating the Double Jeopardy Clause. The *Grady* Court held, "the Double Jeopardy Clause bars a subsequent prosecution if, to establish an essential element of an offense charged in that prosecution, the government will prove conduct that constitutes an offense for which the defendant has already been prosecut-

ed." *Id.* at 510, 110 S.Ct. at 2087, 109 L.Ed.2d at 557. However, just three years later, the *Grady* "same conduct" test was expressly overruled in *Dixon*, with Justice Scalia writing for a majority, joined by Chief Justice Rehnquist and Justices O'Connor, Kennedy, and Thomas. Responding to the *Dixon* dissent's "appealing theory of a 'successive prosecution' strand of the Double Jeopardy Clause that has a different meaning from its supposed 'successive punishment' strand," Justice Scalia, again writing for a majority, stated that "there is *no* authority, except *Grady*, for the proposition that it has different meanings in the two contexts." *Dixon*, 509 U.S. at 703, 113 S.Ct. at 2860, 125 L.Ed.2d at 601 (emphasis in original). We express no opinion today as to whether the Double Jeopardy Clause of the Indiana Constitution, Art. 1, Sec. 14, provides a distinction between these contexts.

added) (citations omitted).[12] Moreover, in *Rutledge v. United States*, 517 U.S. 860, 116 S.Ct. 1241, 134 L.Ed.2d 419 (1996), the most recent multiple punishment case, a unanimous Court focused *only* upon the statutes in question.

■■ We are bound by United States Supreme Court's decisions interpreting the federal Double Jeopardy Clause by virtue of the Supremacy Clause, which provides that the United States Constitution "shall be the supreme law of the land; and the judges in every state shall be bound thereby...." U.S. Const. art. VI. Thus, while "a State is free *as a matter of its own law* to impose greater restrictions on police activity than those this Court holds to be necessary upon federal constitutional standards ..., a State may not impose such greater restrictions as a matter of *federal constitutional law* ...." *Oregon v. Hass*, 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570, 576 (1975) (emphasis in original).

Constrained by the Supremacy Clause to bring our decisions interpreting the federal Double Jeopardy Clause in line with federal jurisprudence,[13] we therefore recognize that the United States Supreme Court's "same elements" test requires that we look only to the statutory elements of the offenses, not to the charging information, the jury instructions outlining the elements of the crime, or the underlying proof needed to establish the elements.

■■ In the case at bar, the defendant was convicted of Murder, Robbery as a Class A felony, Conspiracy to Commit Robbery and Conspiracy to Commit Battery. His first and second claims are that double jeopardy prevents his convictions for Murder and Robbery and/or Robbery as a Class A felony. The murder statute, as it appeared in 1983, provided, in pertinent part, "A person who: knowingly or intentionally kills another human being; ... commits murder, a felony." IND.CODE § 35–42–1–1(1) (1982). In 1983, the robbery statute provided, in pertinent part that a person commits robbery as a Class C felony, if he "knowingly or intentionally takes property from another person or from the presence of another person: (1) by using or threatening the use of force on any person; or (2) by putting any person in fear." IND.CODE § 35–42–5–1 (1982). It is a Class A felony if the robbery results "in either bodily injury or serious bodily injury to any person other than a defendant." *Id.* It is clear that each statute requires proof of an additional fact which the other does not: Murder requires a knowing or intentional *killing*; Class A Robbery requires that *property* be taken, resulting in some type of bodily injury to a person other than the defendant. Accordingly, we find no double jeopardy violation and, therefore, as to this claim, the defendant has failed to establish prejudice suffered as a result of appellate counsel's failure to raise this issue.

■■■ However, with respect to his sentences for both Conspiracy to Commit Battery and Conspiracy to Commit Robbery,[14]

---

**12.** While Justices Blackmun and Scalia expressed no *clear* opinion as to multiple punishments, Justice Blackmun specifically approved of Justice Souter's concurrence in *Dixon*. Similarly, Justice Scalia—while finding reason to look outside the statute in certain instances involving successive prosecution and lesser-included offenses, species of lesser-included offenses (*see, e.g., Harris v. Oklahoma*, 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977); *Illinois v. Vitale*, 447 U.S. 410, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980)), and summary contempt proceedings (*Dixon*)—has very recently expressed his view that, in other situations, the *Blockburger* test "focuses on the statutory elements of the two crimes with which a defendant has been charged, not on the proof that is offered or relied upon to secure a conviction." *Grady*, 495 U.S. at 528, 110 S.Ct. at 2097, 109 L.Ed.2d at 569 (Scalia, J., dissenting).

**13.** *Accord Jackson v. State*, 625 N.E.2d 1219, 1222 (Ind.1993) (wherein Chief Justice Shepard notes that *Dixon* may call into question "the distinction drawn in *Malott* and *Mitchell* ...") (citing *Mitchell v. State*, 541 N.E.2d 265 (Ind. 1989); *Malott v. State*, 485 N.E.2d 879 (Ind. 1985)).

**14.** Indiana has a general conspiracy statute which provides: "(a) A person conspires to commit a felony when, with intent to commit the felony, he agrees with another person to commit the felony. A conspiracy to commit a felony is a felony of the same class as the underlying felony. However, a conspiracy to commit murder is a Class A felony. (b) The state must allege and prove that either the person or the person with whom he agreed performed an overt act in furtherance of the agreement." IND.CODE § 35–41–5–2 (1982).

we find that the defendant has established prejudice. The United States Supreme Court has developed a body of case law specific to multiple conspiracies, beginning with the seminal case of *Braverman v. United States,* 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942), in which the defendants had been convicted of seven counts of conspiracy to violate federal tax laws. The United States Supreme Court held that, when there is a general conspiracy statute and only one agreement, there can only be one conviction, regardless of the separate substantive crimes which have been committed.[15] Thus, the determinative question is whether there was one agreement:

> Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one.

*Id.* at 53, 63 S.Ct. at 102, 87 L.Ed. at 28. *See also Gregory v. State,* 524 N.E.2d 275, 278 (Ind.1988) ("[W]hen there is only one agreement to enter into a scam that will cause one or more crimes, it is improper to sentence a defendant for conspiracy to commit each of the separate crimes in that only one conspiracy exists. The sentencing of [a defendant] on both conspiracy charges constitute[s] double jeopardy violating his constitutional rights.").

▮▮▮▮ In the case at bar, the State concedes that there was only one agreement. As such, we find that the defendant has established prejudice. Under the performance prong of *Strickland,* counsel is afforded much discretion in choosing tactics. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694–95. The proper measure of attorney performance is reasonableness

under prevailing professional norms. *Id.* at 688, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. It shall be strongly presumed that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695.

Notwithstanding this deferential standard, we find that, under prevailing professional norms, there is no reasonable strategy for failing to raise this clear double jeopardy violation. We therefore vacate the conviction for Conspiracy to Commit Battery.

**4. Ineffective Assistance of Counsel Due to Systemic Defects in the Marion County Superior Court Indigent Defense System**

▮▮▮▮ The defendant argues that the post-conviction court erred in rejecting his claim that the Marion County indigent defense system, as it existed in the early and mid–1980s, was systemically defective. Citing *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), the defendant argues that effective assistance of counsel from that office was so unlikely that ineffectiveness should be presumed.

In *Cronic,* the defendant was charged with mail fraud. Shortly before trial, his retained counsel withdrew and the court appointed a real estate attorney with no jury trial experience, giving the attorney twenty-five days to prepare, even though the Government had prepared for over four and one-half years. The Tenth Circuit Court of Appeals reversed his conviction on ineffective assistance of counsel grounds, but did not determine whether counsel's performance was deficient or whether the defendant had been prejudiced.

Reversing, the United States Supreme Court found that the circumstances in *Cronic* did not amount to ineffective assistance of counsel. However, the Court did observe that there may be limited circumstances of

**15.** Where the multiple conspiracy charges arise out of two separate conspiracy statutes, the permissibility of multiple punishments depend on a *Blockburger* analysis. *See American Tobacco Co. v. United States,* 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946) (distinguishing *Braverman* on the basis that it involved a single conspiracy described in separate counts that were charged

under a general conspiracy, whereas *American Tobacco* involved the violation of two separate conspiracy statutes); *Albernaz v. United States,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981) (applying *Blockburger,* each of the two conspiracy statutes required elements not found in the other statute and thus separate conspiracy convictions were possible).

extreme magnitude which justify "a presumption of ineffectiveness" and such circumstances are, in and of themselves, "sufficient without inquiry into counsel's actual performance at trial." *Id.* at 662, 104 S.Ct. at 2048, 80 L.Ed.2d at 670. Such circumstances "are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Id.* at 658, 104 S.Ct. at 2046, 80 L.Ed.2d at 667. As noted by Justice Powell, *Cronic* stands for the proposition that, "[i]n such circumstances, the defendant is in effect deprived of counsel altogether, and thereby deprived of *any* meaningful opportunity to subject the State's evidence to adversarial testing." *Kimmelman v. Morrison,* 477 U.S. 365, 395 n. 2, 106 S.Ct. 2574, 2593–94 n. 2, 91 L.Ed.2d 305, 333 n. 2 (1986) (Powell, J., concurring) (emphasis added).

*Cronic* provides a narrow [16] "exception" to the traditional *Strickland* two prong analysis. Under *Cronic,* certain circumstances will negate the *Strickland* requirement that a defendant establish both specific errors leading to deficient performance and actual prejudice. However, if the circumstances do not give rise to a *Cronic* exception, to establish ineffective assistance of counsel, a defendant must fulfill the individualized requirements of *Strickland. See Cronic,* 466 U.S. at 659 n.

26, 104 S.Ct. at 2047 n. 26, 80 L.Ed.2d at 668 n. 26.

*Cronic* delineated three circumstances justifying this presumption: (1) the complete denial of counsel; (2) situations when counsel entirely fails to subject the prosecution's case to meaningful adversarial testing; [17] (3) situations where surrounding circumstances are such that, "although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id.* at 659–60, 104 S.Ct. at 2047, 80 L.Ed.2d at 668. In the present case, the defendant is attempting to use the third circumstance identified in *Cronic* to establish a presumption that the defects and unfavorable conditions existing in the Marion County indigent defense system were so extreme that those who received indigent representation during this time necessarily received ineffective assistance of counsel.

To presume prejudice under *Cronic,* it must be shown that the circumstances completely deprived defendants of any meaningful opportunity to subject the State's evidence to adversarial testing. As this is an appeal from a post-conviction negative judgment, the defendant must convince this

---

**16.** Federal courts have uniformly held that the circumstances to which *Cronic*'s presumption applies are "very limited in number," *Nielsen v. Hopkins,* 58 F.3d 1331, 1335 (8th Cir.1995), applying only when "the defendant was in effect denied any meaningful assistance at all," *Chadwick v. Green,* 740 F.2d 897, 901 (11th Cir.1984), and that the "burden of proof under *Cronic* is a very heavy one." *Stone v. Dugger,* 837 F.2d 1477, 1479 (11th Cir.1988), *cert. denied* 489 U.S. 1071, 109 S.Ct. 1354, 103 L.Ed.2d 821 (1989). *Cronic*-like principles have only successfully been applied in a few circumstances. *See, e.g., Tucker v. Day,* 969 F.2d 155, 159 (5th Cir.1992) (defendant's lawyer sat in total silence throughout resentencing proceeding); *Bonneau v. United States,* 961 F.2d 17, 23 (1st Cir.1992) (defendant's appeal was dismissed due to his lawyer's failure to file a brief); *United States v. Mateo,* 950 F.2d 44, 48–50 (1st Cir.1991) (no attorney appeared despite a defendant's unwaived right to appointed counsel); *United States ex rel. Thomas v. O'Leary,* 856 F.2d 1011, 1016–17 (7th Cir. 1988) (defense counsel filed no brief during state's appeal of a suppression order and the ensuing decision was thus based only on the

record and the government's brief); *Green v. Arn,* 809 F.2d 1257, 1259–64 (6th Cir.1987) (defense attorney was absent from the courtroom during a critical part of the trial); *Martin v. Rose,* 744 F.2d 1245, 1250–51 (6th Cir.1984) (prejudice presumed when counsel did not participate in trial at all).

**17.** "The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted— even if defense counsel may have made demonstrable errors—the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated.... While a criminal trial is not a game in which the participants are expected to enter the ring with a near match in skills, neither is it a sacrifice of unarmed prisoners to gladiators." *Cronic,* 466 U.S. at 656–57, 104 S.Ct. at 2045–46, 80 L.Ed.2d at 666–67 (citations omitted).

Court that the evidence presented during the post-conviction proceeding is without conflict and, as a whole, leads unerringly and unmistakably to a decision opposite the post-conviction court's rejection of his claim of systemic defects. *Spranger v. State,* 650 N.E.2d 1117, 1119 (Ind.1995).

Attempting to establish that the conditions in the Marion County indigent defense system in the early to mid–1980s completely deprived defendants of any meaningful opportunity to subject the State's evidence to adversarial testing, the defendant presented testimony that, at the time the defendant was convicted, the public defenders served individual judges in the criminal superior courts. This employment was at-will and was based on political patronage. The public defenders worked part-time, received minimal pay, forcing most to maintain a private practice in addition to their indigent criminal case load. If a public defender wanted to hire an expert or investigator, he or she had to request, by motion, funds from the court—although there was testimony that the public defenders did not pursue this avenue often, as they felt the money would not be available. The public defenders did not have their own libraries and most were forced to use the secretaries and paralegals from their private practices.

The defendant also presented testimony from Robert Spangenberg, as an expert witness in the field of public defender systems, who analyzed these conditions and concluded that, "there was a reasonable likelihood that counsel would not be able to provide competent representation given the surrounding circumstances in Marion County during [the period 1980 to 1986]." P.C.R. Record at 2040. Norman Lefstein, law professor and Dean of the Indiana University School of Law at Indianapolis, stated that "there would be a substantial risk that the attorney could not provide reasonably competent assistance of counsel...." P.C.R. Record at 2181. While this testimony demonstrates that the conditions in the Marion County Public Defender's Office were far from exemplary, it does not establish that defendants were, as a matter of law, completely deprived any meaningful opportunity to challenge the State's evidence. In fact, when asked whether it was impossible for an indigent defendant to get effective representation in Marion County in 1983, Dean Lefstein responded in the negative, testifying "that states it too strongly." P.C.R. Record at 2181.

Additionally, on cross-examination, Spangenberg was presented with his own summaries of interviews with Marion County Public Defenders. One public defender stated that the public defenders "were very competent, capable and conscientious. They went beyond normal duties, they were not in it for the money and many were devoted to what they were doing." P.C.R. Record at 2083. Another public defender stated that "most [public defenders] did a credible job, some are good, some are bad ... he could not find much fault with their lawyering." P.C.R. Record at 2084. Another stated that the public defenders in the judge's court were the "cream of the crop, they were experienced and competent, a steady crew." P.C.R. Record at 2084. One Marion Superior Court Judge stated that the "quality of representation provided by his public defenders ... exceeded that of the deputy prosecutor's office." P.C.R. Record at 2084. Another judge stated that "the quality of trial public defenders ... [was] far superior to private attorneys because they develop an expertise in criminal law." P.C.R. Record at 2084. Another interviewee stated that she never saw a judge refuse funds for investigation, and Spangenberg could not name any specific cases in which a capital defendant was denied a request for an investigator.

According to Dean Lefstein, no public defender "ever acknowledged that they ... failed to provide effective assistance of counsel." P.C.R. Record at 2194. Similarly, Arnold Baratz, a part-time public defender in Marion County Superior Courts from 1975 to the present, testified that he was provided with additional resources for experts and investigators in all of his death penalty cases. He also testified that, during the time in question, no one was ever fired for inadequate representation of their clients and that he provided effective assistance of counsel to all of his public defender clients throughout his tenure as a public defender in Marion

County, including the time period in question. Thus, the evidence presented during the post-conviction proceeding is not without conflict and, as a whole, does not lead unerringly and unmistakably to a decision opposite that reached by the post-conviction court.

The defendant separately claims that, because of the indigent defense system's inadequate funding:

> [I]ndigent defendants such as Games were deprived of the funds necessary to conduct an adequate investigation, access to independent experts to consult and assist the defense, support services necessary to conduct a constitutionally adequate defense, and the facilities necessary for competent investigation, research, preparation and presentation.

Brief of Appellant at 51. The record in the present case does not support this contention. Public defender Grant Hawkins was appointed as trial counsel for the defendant. Hawkins had previous experience representing defendants in the guilt phase of a death penalty case and had attended a legal seminar on the defense of capital cases prior to the defendant's trial. While Hawkins never attempted to secure funds for consultations with expert witnesses, he did petition for—*and receive*—funds to hire a private investigator to assist in his trial preparation. That investigator, Bill Snyder, interviewed witnesses, family members, friends, and neighbors of the defendant. The private investigator also interviewed the codefendant and investigated the defendant's background and the neighborhood in which the defendant lived. He also investigated the background of the victim. Hawkins filed many pleadings on behalf of the defendant and lodged objections to several of the State's pre-trial motions and requests. Hawkins also petitioned for—*and received*—funds to hire a law student to assist in his trial investigation, research, preparation and presentation. This evidence undermines the defendant's contention that he was deprived of an adequate investigation or support services due to lack of funds.

Furthermore, the defendant does not assert and establish that individualized errors due to systemic problems undermined the reliability of his convictions. *Accord Cronic,* 466 U.S. at 659 n. 26, 104 S.Ct. at 2047 n. 26, 80 L.Ed.2d at 668 n. 26 (stating that "[a]part from circumstances of that magnitude, however, there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt [under *Strickland* ]").

While not minimizing the seriousness of the then-existing conditions, the burden under *Cronic* is extremely heavy. The evidence is not without conflict and, as a whole, does not lead unerringly and unmistakably to a decision that indigent defendants in the early to mid 1980s were systemically deprived of any meaningful opportunity to subject the State's evidence to adversarial testing. We therefore reject the defendant's argument that systemic defects existing in 1983 entitle him to relief on his ineffective assistance of counsel claim.

### Conclusion

The judgment of the post-conviction court is affirmed, with the exception of the multiple conspiracy convictions, wherein we find that the conviction for Conspiracy to Commit Battery must be vacated. Consistent with the post-conviction judgment, this cause is remanded to the trial court for the remaining penalty phase proceedings.

SHEPARD, C.J., and SELBY and BOEHM, JJ., concur.

SULLIVAN, J., concurs with separate opinion.

SULLIVAN, Justice, concurring.

I am not as sure as my colleagues of the impact on our interpretation of federal double jeopardy jurisprudence caused by the Supreme Court's opinion in *United States v. Dixon,* 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993) (particularly on our interpretation of it in a case like *Buie v. State,* 633 N.E.2d 250 (Ind.1994), which involved a multiple prosecution, not multiple punishment, issue). I fully concur in the opinion, however, because, whatever the nuances of federal constitutional law in this area after *Dixon,* today's opinion makes no change in Indiana

constitutional or statutory law in this regard and so the precedential value of our earlier cases is not affected. Certainly I agree that the two double jeopardy claims rejected here on federal double jeopardy grounds would be decided the same way under Indiana law: (1) sentencing Games for both Murder and Robbery, *see, e.g., Flowers v. State,* 481 N.E.2d 100, 106 (Ind.1985) (sustaining convictions for knowing and intentional murder and robbery); (2) sentencing Games for both Murder and Class A felony Robbery, *see, e.g., Woods v. State,* 677 N.E.2d 499, 501–502 (Ind.1997) (sustaining convictions for murder and Class A robbery because the force necessary to elevate robbery conviction to Class A felony was different from the force necessary to kill the victim).