Alton COLEMAN, Appellant
(Petitioner Below),

v.

STATE of Indiana, Appellee
(Respondent Below).

No. 45S00–9203–PD–158.

Supreme Court of Indiana.

Dec. 29, 1998.

---

Susan K. Carpenter, Public Defender, Kathleen Cleary, Robert E. Lancaster, Deputy Public Defenders, Indianapolis, for Appellant.

Jeffrey Modisett, Attorney General, Christopher L. Lafuse, Deputy Attorney General, Indianapolis, for Appellee.

Charles A. Asher, South Bend, for Amicus Curiae Indiana Association of Criminal Defense Lawyers.

SHEPARD, Chief Justice.

A jury found Alton Coleman guilty of murder, attempted murder, and child molesting. Following the jury's recommendation, the court sentenced Coleman to death. We affirmed on direct appeal. *Coleman v. State*, 558 N.E.2d 1059 (Ind.1990). Coleman filed a petition for post-conviction relief challenging his convictions and death sentence. Judge Richard J. Conroy denied the petition, and Coleman now appeals that ruling. We affirm.

### Statement of Facts

Our earlier opinion summarizes the facts of Coleman's crime:

> In June 1984, Coleman and his companion Debra Brown approached two young girls in Gary. The girls were ten-year-old A.H. and her seven-year-old niece, Tamika Turk. They enticed the girls into a wooded area with a friendly offer of clothing. Once there, Coleman told the girls that he was going to play a game. He then took off Tamika Turk's pink shirt, cut it into shreds with a pocket knife, and tied both girls' hands, mouth and legs.

> Tamika began crying. Coleman responded by stomping viciously on her face, chest and stomach with his foot. Afterward, Coleman and Brown carried Tamika away. Tamika's body was later discovered with a piece of bed clothing tied around her neck.

> Coleman next forced A.H. to perform oral sex on him and on Brown. While A.H. was performing oral sex on Brown, Coleman raped A.H. Finally, Coleman and Brown simultaneously strangled A.H. with their belts until she passed out. Incredibly, A.H. regained consciousness and walked out of the wooded area. A young woman and her mother noticed A.H., took her in, and eventually called an ambulance. At the hospital, doctors discovered cuts so deep in A.H.'s vaginal area that her intestines were protruding into her vagina.

*Coleman*, 558 N.E.2d at 1060–61.

### I. Statement of the Issues

Coleman enumerates fourteen issues in this appeal. Some of those claims are barred by res judicata and some are waived. Of the remaining issues, we restate several and address them each. Coleman's arguments fall under these main categories:

1. Whether Coleman received ineffective assistance of counsel (IAC) at trial;

2. Whether Coleman received ineffective assistance of appellate counsel;

3. Whether Coleman's trial counsel suffered under an actual conflict of interest which adversely affected his performance;

4. Whether Coleman's jury was exposed to extraneous influences during trial thereby violating Coleman's right to a fair and impartial jury and his right to due process;

5. Whether the trial court erred in denying Coleman funds for an expert on eyewitness identification at trial;

6. Whether the trial court denied Coleman due process by not providing a competent mental health examination before Coleman's decision not to testify;

7. Whether the trial court improperly instructed the jury;

8. Whether Magistrate T. Edward Page's involvement in the proceedings denied Coleman his rights of due process, equal protection, and to a full and fair post-conviction hearing;

9. Whether the post-conviction court erred in refusing to hear Coleman's arguments on systemic deficiencies in the Lake County Public Defender System;

10. Whether the trial court properly sentenced Coleman.

## II. Petitioner's Burdens in Post–Conviction Proceedings

Post-conviction procedures do not afford convicts the opportunity for a "super-appeal." *Bailey v. State*, 472 N.E.2d 1260, 1263 (Ind.1985) (citing *Langley v. State*, 256 Ind. 199, 210, 267 N.E.2d 538, 544 (1971)). Rather, they create a narrow remedy for subsequent collateral challenges to convictions. *Weatherford v. State*, 619 N.E.2d 915, 916–17 (Ind.1993). Petitioners must establish their grounds for relief by a preponderance of the evidence. Ind.Post–Conviction Rule 1, § 5. A petitioner appealing the denial of post-conviction relief, moreover, labors under a heavier burden:

> On appeal [from the denial of post-conviction relief], petitioner stands in the position of one appealing from a negative judgment. In such cases, it is only where the evidence is without conflict and leads to but one conclusion, and the trial court has reached the opposite conclusion, that the decision will be disturbed as being contrary to law.

*Fleenor v. State*, 622 N.E.2d 140, 142 (Ind. 1993), *cert. denied*, 513 U.S. 999, 115 S.Ct. 507, 130 L.Ed.2d 415 (1994). Such a petitioner must show that the evidence, taken as a whole, "leads unerringly and unmistakenly to a conclusion opposite to that reached by the trial court." *Weatherford*, 619 N.E.2d at 917;

*see Lowe v. State*, 455 N.E.2d 1126 (Ind. 1983).

In the present case, the post-conviction court entered findings of fact and conclusions of law in accordance with Indiana Post–Conviction Rule 1, § 6. When the post-conviction court enters such findings, the reviewing court "will affirm if the court's findings are sufficient to support the judgment." *Lile v. State*, 671 N.E.2d 1190, 1192 (Ind.Ct. App.1996); *Neville v. State*, 663 N.E.2d 169, 172 (Ind.Ct.App.1996). A post-conviction court's findings and judgment will be reversed only if clearly erroneous; "to determine whether the findings or judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom. . . ." *Douglas v. State*, 634 N.E.2d 811, 815 (Ind. Ct.App.1994). In short, the question before us is only "whether there is no way the court could have reached its decision." *Spranger v. State*, 650 N.E.2d 1117, 1120 (Ind.1995).

## III. Ineffective Assistance of Trial Counsel

The post-conviction court deemed Coleman's claims of ineffective assistance of trial counsel waived for not having been raised on direct appeal. (P–C.R. at 1746.) [1] As a general rule, "[t]he post-conviction relief process is open to the raising of issues not known at the time of the original trial and appeal or for some reason not available to the defendant at that time." *Howey v. State*, 557 N.E.2d 1326, 1328 (Ind.1990). The post-conviction court held, and the State now argues, that the issue of ineffective assistance of trial counsel was available on direct appeal, and since it was not raised then, it was therefore waived. On behalf of Coleman, amicus [2] argues that current Indiana case law regarding the proper time for an appellant to bring trial IAC claims presents a "Hobson's choice." (*Amicus* Br. at 13.) The gestalt of our law on the availability of such claims has recently been scrutinized. While this case has been under review, we have decided that claims of ineffective assistance

---

**1.** The record of the post-conviction proceedings will be cited as P–C.R. The trial record will be cited as T.R.

**2.** The Indiana Association of Criminal Defense Lawyers filed a brief as *Amicus Curiae* in support of Coleman.

of counsel may be presented for the first time in a petition for post-conviction relief. *Woods v. State,* 701 N.E.2d 1208 (Ind.1998). Nevertheless, Coleman does not prevail on this claim, because his offers of proof do not establish ineffective assistance of trial counsel as a matter of law,[3] and the action of the trial court may be sustained "on any legal ground on the record." *Cain v. State,* 261 Ind. 41, 45–46, 300 N.E.2d 89, 92 (1973).

◼ *A. Standard of Review for IAC Claims.* To make a successful ineffective assistance claim, a convict must demonstrate both deficient performance and resulting prejudice. One must show his attorney's performance "fell below an objective standard of reasonableness," *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see also Douglas v. State,* 663 N.E.2d 1153, 1154 (Ind.1996), and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *see also Cook v. State,* 675 N.E.2d 687, 692 (Ind.1996). Of course, "a different outcome but for counsel's error will not constitute prejudice if the ultimate result reached was fair and reliable." *Smith v. State,* 689 N.E.2d 1238, 1245 (Ind.1997) (quoting *Games v. State,* 684 N.E.2d 466, 469 (Ind.1997) (citing *Lockhart v. Fretwell,* 506 U.S. 364, 369–70, 113 S.Ct. 838, 122 L.Ed.2d 180)). We need not determine whether counsel's performance was deficient before examining the prejudice suffered as a result of the alleged deficiencies. *Strickland,* 466 U.S. at 697, 104 S.Ct. 2052 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

◼ Finally, counsel's performance is presumed effective. *Douglas,* 663 N.E.2d at 1154; *Butler v. State,* 658 N.E.2d 72, 78 (Ind.1995). To be successful, Coleman's of-

fers of proof must rebut that presumption. They do not. We will review each of Coleman's major arguments about ineffective assistance of trial counsel.

◼ *B. Mystery Hairs.* After the crime was committed, a rape kit analysis, including a pubic combing, was performed on A.H. Sergeant Michael T. Oliver of the Indiana State Police analyzed the samples from the victim's rape kit. The kit revealed two questioned hairs, one of which was retrieved from the pubic hair combing. Oliver's first analysis of the hairs revealed that they did not belong to A.H. Oliver's second analysis revealed that the hairs were also not Coleman's or Brown's. Both reports were provided to the defense. Oliver could not recall ever being contacted by Coleman's defense counsel, nor was he subpoenaed to testify at trial. Defense counsel Lonnie Randolph vaguely recalled an assault kit having been prepared on A.H., though he could not recall whether he discussed the results with anyone at the State Police Laboratory.

Given the primary theory of the defense, that Coleman did not commit the crimes, we cannot think of a reason for counsel's failure to present evidence that hairs were discovered in the rape kit which did not belong to Coleman or Brown. While one can imagine numerous explanations for the origins of the hairs that do not exculpate Coleman and/or Brown, we agree with appellant's statements that "[t]here can be no valid strategic reason for counsel's failure to present this evidence in support of their theory...." (Appellant's Br. at 42.) As such, counsel's failure to present such evidence satisfies prong one of *Strickland*—performance falling below an objective standard of reasonableness. Coleman's claim of ineffective assistance based on the failure to present the "mystery hair" evidence fails, however, under *Strickland's* second prong—prejudice. Given the amount of evidence presented by the State against Coleman at trial,[4] we are not persuaded that

---

**3.** The post-conviction court's findings and conclusions reflect that Coleman sought to introduce the testimony of dozens of witnesses into evidence via affidavits and depositions in support of his IAC claims. (P–C.R. at 1743.) Because of the court's preliminary findings that the trial IAC claim was waived and the appellate IAC claim

was meritless, the affidavits were accepted only as offers to prove. (*Id.*)

**4.** In its brief, the State summarizes the evidence presented against Coleman:

defense counsel's failure to present the mystery hair evidence rendered his conviction fundamentally unfair or unreliable. *Lockhart*, 506 U.S. at 369, 113 S.Ct. 838.

*C. Failure to Review Discovery.* Coleman argues that his defense counsel failed to review the discovery material prior to trial, or did so in only a cursory fashion. (Appellant's Br. at 44.) Coleman points to seven incidents in the trial transcript purporting to "show that counsel was not apprised of the evidence and discovery." (*Id.*)

▇ Of Coleman's seven record citations on this point, three of them, (T.R. at 486, 1085, 1129–30), may be disposed of in short order. Our review of those citations reveals that when pieces of evidence were presented by the State at trial, only one of Coleman's two trial attorneys had reviewed the item in discovery. Coleman fails to cite any case requiring each of a party's attorneys to review every piece of discovery. Such a rule would undermine a major rationale for having more than one attorney in the first place—division of labor. As long as a member of the trial team was aware of a piece of evidence, an appellant has not established ineffective assistance by showing that not all were aware.

▇ The other instances of Coleman's trial attorneys' alleged failure to review discovery items, (T.R. at 550, 1275–76, 1887, 1910–12), also do not amount to ineffective assistance, but for different reasons. Again assuming without deciding that Coleman's trial

counsel was deficient for failing to review several discovery items,[5] we proceed to evaluate whether the alleged trial errors prejudiced Coleman, as "isolated instances of poor tactics ... do not necessarily amount to ineffectiveness of counsel." *Spranger*, 650 N.E.2d at 1121.

Coleman complains that the failure to review these specific discovery items compromised the adversarial process at the guilt phase of the trial. (Appellant's Br. at 40.) To prove resulting prejudice amounting to the deprivation of a fair trial, "the defendant must demonstrate a reasonable probability that, but for counsel's deficient performance, the result would have been different." *Spranger*, 650 N.E.2d at 1121. Our review of the record leads us to conclude that these alleged failures neither compromised the adversarial process nor adversely impacted the outcome of Coleman's trial.

*D. Failure to Move for a Hair Analysis Expert.* Coleman asserts that failure to request funds for an independent hair analysis expert constituted ineffective assistance. At trial, F.B.I. Special Agent Chester Blythe testified concerning a comparison between hair found at the scene and known hair samples taken from Debra Brown. Blythe testified that the hair samples were consistent with one another, and although hair analysis is not a positive means of identification, the likelihood of the hair found at the scene belonging to someone other than Brown was "very, very remote." (T.R. at 1623.) Following the trial and sentencing, the State

---

[A.H.], one of Coleman's two victim's, positively identified Coleman as the person who molested her and murdered Tamika, both in a photo array and again at trial ( [T.]R. at [927,] 921). Yoland[a] Weems identified Coleman as being in Gary at the time of the crimes, helping him and Brown rent part of the Van Buren house where the bedsheet was found that matched the ligature used to strangle Tamika (T.R. 542, 553). Titus Bullock met Coleman in a candy store in 1984, and observed Coleman walking near 39th and Broadway on the day of the killing (T.R. 1333, 1335). Bullock also testified that Coleman called Brown "Slim," which is the name that [A.H.]'s attacker called his confederate during the attack (T.R. 1334). Following the attack, Coleman fled Lake County, never returning to the Van Buren house after it had been staked out by police (T.R.

1348). Finally, when Coleman was captured by police, he gave a false name (T.R. 1031). (Appellee's Br. at 20.)

5. With regard to a picture of the house in which Coleman was renting an apartment, one of Coleman's attorney's, Collins, could not recall whether he had reviewed the photograph or not. (T.R. at 550.) The other two alleged deficiencies, (T.R. at 1887, 1910–12), actually concern the same "failure to discover." Neither of Coleman's attorneys reviewed one digest of police reports before the State offered the digest at trial. When the defense objected to the admission of the reports, the trial court informed Coleman's attorneys that "this digest is not discoverable under Indiana law." (T.R. at 1912.) Coleman's attorneys maintained that they should at least have been informed of the existence of such a digest. (T.R. at 1911.)

requested that Blythe perform further analysis on the hair. During additional testing, Blythe compared the hair from the scene to both A.H.'s and Brown's hair, concluding finally that the origin of the hair from the scene could not be determined, in contrast to his original conclusion that the hair belonged to Brown.

■ Coleman now argues that "[h]ad counsel sought the assistance of a hair analysis expert, they would have learned that the hair's origin could not be determined." (Appellant's Br. at 46.) We find much merit in the State's response:

> When a claim of ineffective assistance of counsel is based on counsel's failure to object to the admission of evidence, the defendant must show that, had a proper objection been made, the objection would have been sustained. In like fashion, when the claim is based on the failure to request funds for an expert witness, the petition must show that had the request been made, it would have been granted.

(Appellee's Br. at 17–18 (footnote omitted)). Coleman has made no showing that a motion for funds, had it been made, would have been granted. In fact, our standards governing court-appointed experts indicates that such a motion likely would have been denied.

As we have observed:

> In Indiana, a criminal defendant is not constitutionally entitled, at public expense, to any type or number of expert [sic] he desires to support his case. *Pittman v. State* (1988), Ind., 528 N.E.2d 67, 71–72. A judge may authorize or appoint experts where necessary. *Owen v. State* (1979), 272 Ind. 122, 396 N.E.2d 376. The appointment of experts is left to the sound discretion of the trial court, *Lowery v. State* (1985), Ind., 478 N.E.2d 1214, 1220, *cert. denied,* 475 U.S. 1098, 106 S.Ct. 1500, 89 L.Ed.2d 900 (1986), and only an abuse of that discretion will result in a reversal. *Hough v. State* (1990), Ind., 524 N.E.2d 1287, 1288. The defendant who requests that the court appoint an expert witness had the burden of demonstrating the need for the appointment. *Burgans v. State,*

(1986), Ind., 500 N.E.2d 183, 186. A court must provide a defendant access to experts where it is clear that prejudice will otherwise result. *Palmer v. State,* (1985), Ind., 486 N.E.2d 477, 481.

*Kennedy v. State,* 578 N.E.2d 633, 639–40 (Ind.1991), *cert. denied,* 503 U.S. 921, 112 S.Ct. 1299, 117 L.Ed.2d 521. Other Indiana cases have also applied these standards. *E.g., Harrison v. State,* 644 N.E.2d 1243 (Ind.1995); *James v. State,* 613 N.E.2d 15 (Ind.1993); *Bland v. State,* 468 N.E.2d 1032 (Ind.1984).

■ One of the factors a court should consider when exercising its discretion on funding for experts is "whether the nature of the expert testimony involves precise physical measurements and chemical testing, the results of which were not subject to dispute." *Harrison,* 644 N.E.2d at 1253 (citing *Schultz v. State,* 497 N.E.2d 531, 533–34 (Ind.1986)). Coleman's case involves precisely this type of testing, and Blythe's conclusions about the origin of the hair were not in dispute until after the trial and sentencing. During the trial, Blythe stated the possibility of the hairs belonging to someone other than Brown to be "very, very remote." (T.R. at 1623.) Coleman points to nothing to indicate that the trial court, reviewing Blythe's opinion at the time of the trial, would have found any reason to order additional testing at public expense. We find no fault with trial counsel for failing to ask for that which hindsight tells us would have been helpful.

■ *E. Eyewitness Identification Expert.* Coleman says his trial attorneys were ineffective for failing to apprise themselves of relevant facts and law in their failed attempt to convince the court to provide funds for an expert on eyewitness identification. (Appellant's Br. at 47–50.) Counsel did file a motion for funds, including a request to pay an expert on eyewitness identification. The motion requesting funds cited several U.S. Supreme Court cases, as well as several scholarly works on the issues surrounding and problems associated with eyewitness identification.[6] At a hearing on that motion, the

**6.** The defense cited *U.S. v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Gilbert v.*

court concluded that the defense had failed to meet its burden to establish the need for such an expert.

At the time of Coleman's trial, Indiana courts had not determined the admissibility of eyewitness expert testimony. *See Farrell v. State*, 622 N.E.2d 488, 494 (Ind.1993) (declining to rule on admissibility of eyewitness expert testimony on retrial, noting the pending Indiana Rules of Evidence to become effective January 1, 1994). Coleman now asserts that, given the unresolved nature of the admissibility issue, defense counsel should have offered case citations from other jurisdictions to guide the court. (Appellant's Br. at 48.) We think it apparent the Attorney General is correct that "because counsel made the request, supported by appropriate citations to case authority, he did not commit deficient performance for failing to persuade the court to make a discretionary ruling allowing public payment for an eyewitness identification expert." (Appellee's Br. at 19.)

Furthermore, Coleman's claims that the identification procedures "resulted in an unreliable identification" of Coleman by A.H., (Appellant's Br. at 49), were addressed and rejected by this Court in the direct appeal. *See Coleman*, 558 N.E.2d at 1064–65. We decline to revisit the issue here.

*F. IAC at the Penalty and Sentencing Phase.* Coleman asserts that trial counsel failed to conduct a reasonable investigation into mitigating circumstances. The mitigating circumstances which Coleman claims were inadequately investigated include: evidence of his troubled childhood environment, evidence of his troubled family life, and evidence of a personality disorder and brain dysfunction. (Appellant's Br. at 63–64, 64–72, 72–77.)

■ With regard to Coleman's childhood environment and family life, we find it unnecessary to determine whether counsel was deficient for not having investigated these matters further than they did or not having presented this evidence. Assuming Cole-

man's counsel was deficient in these regards, we have regarded this type of evidence to be of low mitigating weight, low enough to demonstrate lack of prejudice in Coleman's case. In *Peterson v. State*, 674 N.E.2d 528, 543 (Ind.1996), *cert. pending*, we stated:

Upon our independent review, we find evidence of the defendant's difficult childhood, his emotional disturbance, his having consumed some alcohol at the time of the offense, his graduation from high school, his service in the Marines, his age, and his caring relationship with his child and her mother. The mitigating weight warranted for each of these considerations is in the low range, individually and cumulatively.

In fact, such evidence is occasionally declared not mitigating at all. *See Loveless v. State*, 642 N.E.2d 974, 977 (Ind.1994) ("[T]he trial court was not obligated to consider Appellant's extremely dysfunctional family background and the impact it wrought on her as a mitigating circumstance when conducting sentencing."); *Lowery v. State*, 547 N.E.2d 1046, 1059 (Ind.1989) ("While such circumstances, particularly the defendant's difficult experiences in childhood and adolescence, may have been sufficient to have been accorded recognition as a mitigating circumstance to be weighed, the trial court was not under an obligation to so find.").

At the guilt phase of the trial, the State proved that Coleman stomped on the face, chest, and stomach of seven-year-old Tamika Turks until she stopped breathing. *Coleman*, 558 N.E.2d at 1060. The State proved that he raped and strangled ten-year-old A.H. in an attempt to kill her. *Id.* The State proved that Coleman had been convicted of two other murders in Ohio. *Id.* at 1065. Given these aggravating circumstances, even had his counsel presented the evidence of Coleman's impoverishment and abuse, we see little likelihood the jury recommendation or trial judge's sentence would have been different. The existence and availability of this body of proof is not "sufficient to undermine

*California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); Elizabeth Loftus, *Eyewitness Testimony* (Harvard University Press 1979); Fredric D. Woocher,

Note, *Did Your Eyes Deceive You? Expert Psychological Testimony of the Unreliability of Eyewitness Identification*, 103 Stan. L.Rev. 969 (1977). (T.R. at 92.)

confidence in the outcome." *Averhart v. State*, 614 N.E.2d 924, 931 (Ind.1993) (citing *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052).

■ Coleman further claims that his trial counsel was ineffective for failing to present evidence that Coleman suffers from Borderline Personality Disorder (BPD) and Organic Brain Dysfunction. Coleman presented the evidence of these disorders at the post-conviction hearing. The court first found that the evidence presented by Coleman regarding the disorders would not have affected the trial outcome, stating:

> The petitioner asserts that he has a diminished intelligence quotient, suffers from organic brain dysfunction, and suffers from a borderline personality disorder. He presented experts who testified that this was the fact of the matter. The state presented experts who concluded otherwise.... In this case, it is the conclusion of the trial court that the petitioner['s] ... psychological composition would not have constituted a mitigating factor which would have outweighed the aggravating factors known to the jury and the trial court judge. In other words, *had the judge or the jury known of the evidence which the petitioner presented at the hearing on the petition for post[-]conviction relief, it would not have made a difference to the ultimate outcome of the trial or sentencing hearing.*

(P–C.R. at 1744 (emphasis added).) The court further found that Coleman does not in fact suffer from either disorder, stating:

> After considering all of the evidence which was presented at the hearing on the petition, we conclude that the petitioner does not suffer from an organic brain dysfunction.... We also conclude that while the petitioner may have personality traits that point to a borderline personality disorder, he does not have a disorder of that significance.

(P–C.R. at 1745.)

As outlined in Part II above, a petitioner appealing from the denial of post-conviction relief labors under a heavy burden. We conclude that the evidence does not lead "unerringly and unmistakenly to a conclusion opposite to that reached by the trial court,"

*Weatherford*, 619 N.E.2d at 917, and that "the court's findings are sufficient to support the judgment," *Lile*, 671 N.E.2d at 1192.

## IV. Ineffective Assistance of Appellate Counsel

In addition to his claim of ineffective assistance of trial counsel, Coleman claims he was also denied the effective assistance of appellate counsel, based on counsel's alleged failure to preserve, raise, and cogently argue meritorious issues. (Appellant's Br. at 91.) The *Strickland* standard for reviewing claims of ineffective assistance applies to appellate counsel as well as trial counsel. *Lowery*, 640 N.E.2d at 1041.

*A. Failure to Raise Trial IAC.* Coleman argues that his appellate counsel was ineffective for failing to raise the issue of trial ineffectiveness. (Appellant's Br. at 92.) As discussed above, Coleman did not receive ineffective assistance of trial counsel. Subsequently, his appellate counsel was not ineffective for failing to raise such a claim.

■ *B. Failure to Challenge Trial Court's Sentencing Order.* Coleman argues that appellate counsel's failure to challenge the findings of the trial court in sentencing Coleman constituted ineffective assistance. The trial court's sentencing order was reviewed sua sponte by this Court on direct appeal. *Coleman*, 558 N.E.2d at 1065. The appropriateness of Coleman's death sentence is res judicata, and appellate counsel was not ineffective for failing to challenge trial court's findings.

■ *C. Failure to Challenge Jury Instructions.* Similarly, counsel was not ineffective for failing to challenge certain jury instructions, as the jury instructions given were appropriate. Jury instructions are largely within the discretion of the trial court, and we will review a court's decisions on jury instructions only for an abuse of discretion. *Nichols v. State*, 591 N.E.2d 134 (Ind.1992). To constitute an abuse of discretion, the instruction given must be erroneous, and the instructions taken as a whole must misstate the law or otherwise mislead the jury. *Reaves v. State*, 586 N.E.2d 847 (Ind. 1992).

■ Coleman notes the court did not instruct the jury on the definitions of "knowingly" or "intentionally." (T.R. at 192–205, 215–36.) Generally, the use of a term of art in a jury instruction requires a further instruction explaining the legal definition of the word. *Abercrombie v. State*, 478 N.E.2d 1236 (Ind.1985).

■ As in *Abercrombie*, "the instructions as given did however inform the jury that guilt must rest upon a knowing or intentional state of mind." 478 N.E.2d at 1239 (T.R. at 219–22). This Court stated in that case:

> Appellant did not tender a more complete instruction containing the definitions or otherwise raise the incompleteness of instructions to the trial court. No special prejudicial effect of the omission is identified. Under the circumstances we are not persuaded the error in instructions impinged a substantial right warranting reversal.

*Abercrombie*, 478 N.E.2d at 1239. Coleman fails to prove any special prejudicial effect resulting from the lack of instructions on "knowingly" or "intentionally." Coleman's appellate counsel was not ineffective for failing to raise this issue.

■ Coleman also claims that the instructions given the jury on the alternate ranges of punishments which could be imposed on Coleman were so grossly misleading as to constitute fundamental error. (Appellant's Br. at 143.) The court instructed the jury on the possible sentences for murder, attempted murder, and child molesting. The court also instructed the jury on the possibility for the sentences to run consecutively or concurrently. Finally, the court instructed the jury on the possibility that a portion of the sentence could be suspended for good time credit. Our review of the instructions given by the trial court leads us to the conclusion that they were a correct and straightforward statement of the law.

Coleman says these instructions were misleading because there was little likelihood of a modest sentence being imposed. Such an argument to the jury would be proper. Counsel on direct appeal need not have taken the time to argue the instructions were improper on these grounds.

*D. Failure to Challenge Denial of Funds for Eyewitness Identification Expert.* Coleman asserts that his appellate counsel was ineffective for failing to challenge the trial court's denial of funds for an eyewitness identification expert. (Appellant's Br. at 96.) As discussed above, when a claim of ineffective assistance is based on counsel's failure to object, the defendant must show that had such an objection been made, it would likely have been sustained. Otherwise, one can not show resulting prejudice. *Lowery*, 640 N.E.2d at 1042. Similarly, when an ineffective assistance claim is based on failure to raise an issue on direct appeal, appellant must demonstrate a reasonable probability that had the issue been raised, the claim would have succeeded.

■ Coleman fails to demonstrate that a challenge to the denial of funds would have succeeded. We would have reviewed such a claim only for abuse of discretion. *Harrison*, 644 N.E.2d at 1253. As we noted above, at the time of Coleman's trial, Indiana courts had not determined the admissibility of eyewitness expert testimony. *See Farrell*, 622 N.E.2d at 494. Although Coleman poses arguments as to why the trial court was wrong to deny him funds for the expert, (Appellant's Br. at 124–33), he has not demonstrated a reasonable probability that had these arguments been raised, they likely would have succeeded on appeal. We conclude that appellate counsel did not provide ineffective assistance by taking a pass on this claim.

### V. Trial Counsel's Alleged Conflict of Interest[7]

■ Coleman claims that one of his trial attorneys, Lonnie Randolph, labored under an actual conflict of interest, depriving Coleman of his Sixth Amendment right to effective counsel. (Appellant's Br. at 84.) "To prevail in this claim of conflict of interest, the defendant must demonstrate to the post-con-

---

7. The post-conviction court failed to address this issue in its findings. We thus choose to address it on the merits.

viction court that trial counsel had an actual conflict of interest and that the conflict adversely affected counsel's performance." *Spranger,* 650 N.E.2d at 1124 (citing *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)). If appellant succeeds in showing an actual conflict of interest adversely affecting performance, prejudice to the appellant will be presumed and ineffective assistance will be shown. The mere possibility of a conflict, however, is not sufficient to impugn a criminal conviction. *Davidson v. State,* 558 N.E.2d 1077 (Ind. 1990).

First, Coleman fails to demonstrate that an actual conflict of interest existed in this case. Second, assuming a potential conflict, Coleman fails to prove the conflict adversely affected the representation of his case.

■ *A. Assignment of Book Rights.* The fact that Randolph received an assignment of rights to Coleman's life story does not present an actual conflict of interest in this case. According to the Indiana Code of Professional Responsibility in place at the time of Coleman's trial, Disciplinary Rule 5–104:[8]

> (B) Prior to the conclusion of all aspects of the matter giving rise to his employment, a lawyer shall not enter into any arrangement or understanding with a client or prospective client by which he acquires an interest in publication rights with respect to the subject matter of his employment or proposed employment.

While Coleman does not allege a specific date Randolph received the assignment of rights to Coleman's story, Randolph testified "That didn't occur until the Illinois situation," (P–C.R. at 2452), which followed the penalty phase of Coleman's Indiana trial. Because the assignment of rights to Coleman's life story did not occur until after Randolph's

representation was completed,[9] no actual conflict of interest occurred.

■ Second, Coleman fails to demonstrate any adverse impact on his trial resulting from the alleged conflict. While he does claim that Randolph limited access to information about Coleman's life story, (Appellant's Br. at 88–90), he fails to substantiate his allegation.[10] Coleman provides no evidence that Randolph's alleged desire to keep the childhood information from becoming public knowledge "consciously or unconsciously influence[d Randolph's] course of conduct" during trial. (Appellant's Br. at 86.)

■ *B. Interview with a Reporter.* On May 3, 1986, the day after the sentencing hearing, a reporter interviewed Coleman at the Lake County Jail. Randolph was present. According to Randolph, Coleman insisted that Randolph be there. (P–C.R. at 2451.) Randolph testified that "the [reporter] paid me for my time." (*Id.*) Coleman now claims that this payment from the reporter to Randolph indicates a conflict of interest adversely affecting Randolph's representation. Rule 1.8(f) of the Indiana Rules of Professional Conduct sanctions such an arrangement within certain guidelines:

> (f) A lawyer shall not accept compensation for representing a client from one other than the client unless:
>
> (1) the client consents after consultation
>
> (2) there is not interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and
>
> (3) information relating to representation of a client is protected as required by [the rules governing confidentiality].

Coleman has not demonstrated that the payment to Randolph by the reporter inter-

---

**8.** Indiana Disciplinary Rule 5–104 was in effect until January 1, 1987, when the Code was supplanted by the Indiana Rules of Professional Conduct.

**9.** Coleman provides no evidence to the contrary.

**10.** In support of his claim that Randolph limited access to his life story, Coleman points to a note written by Randolph, revealed in the post-conviction evidentiary hearing, reading "Rosie, please

have Tonny —— get all of Alton Coleman's letters from his file and put it in a separate manila folder by themselves and give to me for my private file. Thank you LMR." (P–C.R. at 1653.) There was no evidence showing when this note was written. Without more, the existence of this note does not substantiate the claim that Randolph intentionally did not present evidence of Coleman's background.

fered with the attorney's independent judgment, and given the timing of the interview, it is difficult to imagine any.[11] Coleman fails to demonstrate that his attorney's conflict of interest denied him effective assistance of counsel.

## VI. Jury's Exposure to Extraneous Influences

 Coleman claims the jury in his trial was subjected to extraneous influences. (Appellant's Br. at 97.) He complains that the jury saw a woman in the hallway of the courthouse, whom the bailiff identified to them as Debra Brown, after the trial court ruled that they should not view Brown in person. The post-conviction court determined that Coleman's evidence did not establish that the jurors saw Brown in the hallway:

> We are not persuaded that the jurors did see the petitioner's codefendant in the hallway outside the courtroom during the trial. They apparently saw a woman that some of the jurors think, or think they were told by the bailiff, was the codefendant.

(P–C.R. at 1740.)

Our review of the evidence from the post-conviction hearing, particularly the affidavits

11. Coleman offers evidence that Randolph deposited one hundred dollars in Coleman's account at the Lake County jail two days after the interview in support of his conflict of interest claim. (P–C.R. at 4103–05.) Randolph admitted depositing the money but denied that the money was at all connected with the interview. (*Id.*) Coleman "suggests" the payment to Coleman is connected to the payment from the reporter to Randolph, but provides no evidence to that effect. (Appellant's Br. at 87.)

12. None of the five jurors had the same recollection of the incident, nor did all of them recall seeing Brown at all. Juror Turnbull testified, "One day, during the trial as the jury was leaving the jury room, there was an African–American woman in the hallway surrounded by guards. The bailiff immediately took us back into the jury room. The bailiff told the jury that the woman we had seen was Debra Brown." (P–C.R. at 3913.) Juror Robinson testified, "One day during trial, as the jury was leaving the jury room, there was an African–American woman in the hall with guards around her. The bailiff immediately took us back into the jury room. Someone told us that the African–American woman was Debra Brown. I do not recall who told us that information. It could have been the judge or the bailiff." (P–C.R. at 3916.) Juror Wells stated,

of five of the jurors in Coleman's trial, shows there was conflicting evidence.[12] The evidence supports the post-conviction court's judgment on this issue.

 Moreover, even if the jury had viewed Brown, the State would have been able to overcome the presumption of prejudice that would have arisen. A presumption of prejudice arises when the jury is exposed to out-of-court communications with unauthorized persons. *Conrad v. Tomlinson*, 258 Ind. 115, 279 N.E.2d 546 (1972). The State sought to bring Brown into the courtroom and have her stand near Coleman for the purpose of comparing their relative heights and complexions to show how they match A.H.'s descriptions, which were partially comparative in nature. The defense objected on the grounds of relevance and possible prejudicial effect.[13] The parties debated whether the potential prejudice could be avoided by various methods, but the record reflects that the court actually sustained the objection to the showing of Brown on grounds of relevance. (T.R. at 1519 ("I don't see the probative value of her appearance here at all.").)

"One day during trial, as the jury was coming to the court in the morning, there was an African–American woman in the jury room ... with no guards around her. The bailiff immediately took us out of the jury room. The bailiff told us that the African–American woman was Debra Brown." (P–C.R. at 3919.) Juror Degroot testified, "One day during trial, as the jury was leaving the elevator, there was an African–American woman in the hall in handcuffs with a female guard. The bailiff immediately took us into the jury room. There was talk amongst the jurors that the African–American woman was possibly Alton Coleman's girlfriend, Debra Brown." (P–C.R. at 3922.) Finally, Juror Muhammad testified, "During the trial, I heard some of the jurors commenting about seeing an African–American woman, in the hall outside the jury room, with braids in her hair and they speculated it was Debra Brown who they believe was Alton Coleman's girlfriend." (P–C.R. at 3925.)

13. The debate about potential prejudice centered around the possibility of Brown blurting something out if she were brought into the courtroom, when her only purpose was as a physical point of comparison. (T.R. 1517–19, 1522.) Notably, there is no allegation by Coleman that the jury was subjected to any verbal comments from Brown in the hall or the jury room.

The court's primary reason for refusing to allow the State to show Brown was relevance, suggesting that it would not tend to prove or disprove any fact at issue. We conclude that, minimally, Coleman needs to demonstrate that the jury concluded *something* on the basis of a hallway view to warrant relief. He has not done so.

### VII. Eyewitness Identification Expert, Mental Health Examination, and Jury Instructions

While we have addressed each of these issues collaterally in the context of Coleman's ineffective assistance of counsel claims, Coleman seeks review for each of these issues independently on their merits. (Appellant's Br. at 124–33, 133–39, 141–44.) Normally, the post-conviction relief process is only open to the raising of issues not known at the time of the original trial and appeal or somehow not available to the appellant at that time. *Howey v. State*, 557 N.E.2d 1326 (Ind.1990); *Tope v. State*, 477 N.E.2d 873 (Ind.1985). For an issue to be available for post-conviction relief, the issue must either be unavailable at direct appeal or be framed within the context of the post-conviction rules. *Tope*, 477 N.E.2d at 875. Otherwise, an issue shall be deemed waived.

In order to avoid the waiver of his claims regarding an expert on eyewitness identification, mental health examinations, and jury instructions, Coleman alleges that the errors on these points were fundamental, and so denied him due process of law in violation of his constitutional rights. (Appellant's Br. at 132, 133, 142.) In doing so, Coleman hopes to bring these issues under the rubric of the post-conviction rules. P–C.R. 1(1)(a)(1). As we said of our fundamental error exception to the waiver rule in *Canaan v. State*, 683 N.E.2d 227, 236 (Ind.1997), it permits direct review of only the most blatant denials of elementary due process. Our review of these claims reveals nothing of a fundamental nature.

### VIII. Magistrate Issues

■ *A. Change of Judge Motion.* Judge Richard Maroc initially presided over Coleman's post-conviction proceeding. Coleman moved for and received a change of judge pursuant to Indiana Post–Conviction Rule 1(4)(b). While a special judge was being selected, Magistrate T. Edward Page granted a motion for an extension of time made by Coleman. (*Compare* T.R. at 373 (date Conroy, J., assumed jurisdiction) *with* T.R. at 152 (date Page granted motion).) Coleman claims Page was acting under Judge Maroc's authority. Thus, he argues, the grant of Coleman's change of judge motion should have applied to Page as well, thus preventing Page from continuing to serve as magistrate in his case when Special Judge Conroy assumed jurisdiction.

The act under which Page received his authority stated, "The judges of the criminal division may appoint one (1) full-time magistrate under IC 33-4-7. The magistrate continues in office until removed by the judges of the criminal division." Ind.Code Ann. § 33–5–29.5–7.1 (West Supp.1994) (amended 1995). Magistrate Page serves *all* judges on the criminal division, not just Judge Maroc. Thus, even if Page did serve while Judge Maroc remained the judge of record in Coleman's case, that would not disqualify Page from assisting the next judge who assumes the reins.

■ *B. Constitutionality of Lake County Magistrate Act.* Coleman also argues that the Lake County magistrate provision, Ind. Code Ann. § 33–5–29.5–7.1 (West Supp.1994) (amended 1995), which created the position that Magistrate Page occupied in this case, violates multiple provisions of Indiana's Constitution. Coleman failed to allege such constitutional infirmities before the post-conviction court, however, thus waiving them. *See Bayh v. Indiana State Bldg. & Constr. Trades Council*, 674 N.E.2d 176, 179 n. 3 (Ind.1996) (failure to present constitutional question at trial waives it from appellate consideration).

### IX. Systemic Defects in Lake County Public Defender System

Coleman claims that systemic defects and unfavorable conditions in the Lake County public defender system were so extreme at the time of his trial that he necessarily re-

ceived ineffective assistance of counsel.[14] Because this same claim was raised by five other Lake County capital post-conviction petitioners,[15] the court scheduled a single evidentiary hearing at which all six petitioners could present their evidence. (P–C.R. at 1929.) The court subsequently vacated the hearing, however, holding that this claim was not available for post-conviction review, and directed the petitioners to present their evidence as a Record of Excluded Evidence.

Although the court stated that the systemic defects claim was not cognizable in a post-conviction hearing, the court's findings state that Coleman waived this claim. It reasoned that any such claim pertaining to trial counsel was available on direct appeal, and that the evidence as it related to appellate counsel was irrelevant because it indicated problems with the public defender system generally, rather than relating to anything specific to Coleman's case. (P–C.R. at 1745b–46a.)

 We conclude this issue was available for collateral review. First, rather than appearing in the trial record where appellate counsel could have found and raised the issue, the evidence allegedly showing systemic defects in the Lake County public defender

system comes from extraneous sources, such as the testimony of former and current public defenders and experts on public defense systems and criminal defense generally. While claims available but unraised on direct appeal can be deemed waived from post-conviction review, claims based upon evidence unavailable on direct appeal are not waived and are appropriate for post-conviction review, see P–C.R. 1(1)(a)(4). Second, as relates to appellate counsel, although the post-conviction court used the term "waiver," it appears that the court actually determined the evidence irrelevant, and thus inadmissible. (See P–C.R. at 1746a–46b (finding the proposed testimony of witnesses to contain "nothing about the performance of the public defenders in this case" and the report of the expert to be "conclusionary reasoning" based upon "gossip" and "guesswork").)

We recently addressed a claim similar to Coleman's, pertaining to Marion County's indigent defense system, in *Games v. State,* 684 N.E.2d 466 (Ind.1997). There we discussed "systemic defects" and *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), the seminal case on this issue, at length. *See Games,* 684 N.E.2d at 478–79.[16] We stated, "*Cronic* provides a nar-

---

**14.** Specifically, Coleman's petition alleged the following:

(1) At the time of Coleman's trial, each judge of the Lake County Superior Court selected the attorneys who served as public defenders in that court.

(2) Expenditures necessary for the representation of indigent defendants at trial and on appeal are requested directly from the courts with payments from the funds apportioned by the courts.

(3) The public defender budget is exclusively controlled by the courts.

(4) The public defender support staff members are hired and compensated by the courts. The investigative staff performs duties for the courts as well as for the public defenders.

(5) Public defenders initially hired by and assigned to a particular court are required to represent indigent defendants in other courtrooms and therefore before other Lake County Superior Court judges. This additional requirement does not exempt a public defender so assigned from the regular workload.

(6) The Lake County judges exert control over both the trial and appellate public defenders in an "employment at will" arrange-

ment with the courts such that additional duties and/or requirements of employment can be made without consideration to the adequacy of the representation to the indigent defendants. The public defenders are powerless to defend against the actions of the courts and, even if the court's action causes the quality of representation to suffer, the public defenders are without recourse.

(7) The appellate defenders in Lake County did not have the budget or access to investigators and could not undertake effective investigation into claims which require factual investigation.

(P–C.R. at 1217 (emphasis omitted).)

**15.** William Benirschke, Alan Matheney, Phillip McCollum, Reynaldo Rondon, and Johnny Townsend. (P–C.R. at 1811–12.) Apparently, however, Matheney subsequently dropped this claim from his petition. (*Compare* T.R. at 1920–21 *with* T.R. at 1380.)

**16.** As in *Games,* we have rejected claims based on *United States v. Cronic* in two other cases, ones arising in Lake County. *Brown v. State,* 698 N.E.2d 1132, 1145 (Ind.1998); *Roche v. State,* 690 N.E.2d 1115, 1135 (Ind.1997).

row 'exception' to the traditional *Strickland* two prong analysis. Under *Cronic*, certain circumstances will negate the *Strickland* requirement that a defendant establish both specific errors leading to deficient performance and actual prejudice." *Id.* at 479. We noted that *Cronic* delineated three such circumstances, one of which arose when situations surrounding a lawyer's representation are such that " 'the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial,' " *id.* (quoting *Cronic*, 466 U.S. at 659–60, 104 S.Ct. 2039).

As the Supreme Court of Illinois observed when reviewing Coleman's similar allegations against Illinois' Lake County public defender office, *see People v. Coleman*, 168 Ill.2d 509, 214 Ill.Dec. 212, 660 N.E.2d 919, 936–37 (Ill. 1995), examination of the examples given in the *Cronic* opinion sheds further light on what this dicta in *Cronic* really means.[17] First, *Cronic* discusses *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), as an example of a case in which circumstances surrounding a lawyer's representation were so bad that ineffectiveness could be presumed without inquiry into the actual conduct of the trial. *Cronic*, 466 U.S. at 660–61, 104 S.Ct. 2039. In *Powell*,

> [t]he defendants had been indicted for a highly publicized capital offense. Six days before trial, the trial judge appointed "all members of the bar" for purposes of arraignment. "Whether they would represent the defendants thereafter if no counsel appeared in their behalf, was a matter of speculation only, or, as the judge indicated, of mere anticipation on the part of the court." [*Powell*, 287 U.S. at 56, 53 S.Ct. 55.] On the day of the trial, a lawyer from Tennessee appeared on behalf of persons "interested" in the defendants, but stated that he had not had an opportunity to prepare the case or to familiarize himself with local procedure, and therefore was unwilling to represent the defendants on such short notice. The court decided that the Tennessee lawyer would represent the defendants, with whatever help the local bar could provide.

*Cronic*, 466 U.S. at 660, 104 S.Ct. 2039.

Second, a *Cronic* footnote cites *Chambers v. Maroney*, 399 U.S. 42, 59, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) (Harlan, J., concurring in part and dissenting in part); *House v. Mayo*, 324 U.S. 42, 45, 65 S.Ct. 517, 89 L.Ed. 739 (1945); *White v. Ragen*, 324 U.S. 760, 764, 65 S.Ct. 978, 89 L.Ed. 1348 (1945) (per curiam); and *Ex parte Hawk*, 321 U.S. 114, 115–16, 64 S.Ct. 448, 88 L.Ed. 572 (1944) (per curiam), as further exemplifying instances in which surrounding circumstances would make counsel constitutionally ineffective, per se. *Cronic*, 466 U.S. at 661 n. 28, 104 S.Ct. 2039. In *Chambers* Justice Harlan wrote, "Where counsel has no acquaintance with the facts of the case and no opportunity to plan a defense, the result is that the defendant is effectively denied his constitutional right to assistance of counsel." *Chambers*, 399 U.S. at 59, 90 S.Ct. 1975 (Harlan, J., concurring and dissenting). *White* states "that it is a denial of the accused's constitutional right to a fair trial to force him to trial with such expedition as to deprive him of the effective aid and assistance of counsel." 324 U.S. at 764, 65 S.Ct. 978. *House* involved a situation where "the trial court, without warning, and over petitioner's protests, forced him to plead to the information without the aid and advice of his counsel, whose presence he requested." 324 U.S. at 45–46, 65 S.Ct. 517. *Ex parte Hawk* involved allegations "that the state court forced [the petitioner] into trial for a capital offense, . . . with such expedition as to deprive him of the effective assistance of counsel . . . and that his conviction was based in part on the introduction at the trial of

---

17. Coleman writes, "In *Cronic*, the circumstances surrounding the representation were so bad that the United States Supreme Court ruled that the *Strickland* presumption of effectiveness should not apply. Rather, prejudice was presumed." (Appellant's Rep. Br. at 36.) Actually, the exact *opposite* is true. The Court held that "[t]his case is *not* one in which the surrounding circumstances make it unlikely that the defendant could have received the effective assistance of counsel. . . . Respondent can therefore make out a claim of ineffective assistance *only* by pointing to specific errors made by trial counsel." *Cronic*, 466 U.S. at 666, 104 S.Ct. 2039 (emphasis added).

evidence known by the prosecution to be perjured...." 321 U.S. at 115–16, 321 U.S. 114.

 "[T]he burden under *Cronic* is extremely heavy." *Games*, 684 N.E.2d at 481. *"[O]nly* when surrounding circumstances justify a presumption of ineffectiveness can a Sixth Amendment claim be sufficient without inquiry into counsel's actual performance at trial." *Cronic*, 466 U.S. at 662, 104 S.Ct. 2039 (emphasis added). We think the Illinois Supreme Court was correct that such a presumption is justified only in cases involving circumstances of similar character and magnitude as those cited as examples in *Cronic*. *See Coleman*, 214 Ill.Dec. 212, 660 N.E.2d at 936.

 A presumption of ineffectiveness is not justified from Coleman's proposed evidence. Even if true, the evidence only indicates problems in Lake County's public defender system generally. Coleman offers no evidence indicating that the alleged difficulties had any influence on his counsel specifically, which is the constant theme throughout the cases cited in *Cronic* as examples of per se prejudice,[18] nor do we think deleterious influence can automatically be presumed.

First, Coleman's Record of Excluded Evidence cited potential testimony from various Lake County public defenders who all testified about general conditions and personal complaints with Lake County's system. For example, Coleman intended to call Daniel Toomey, who Coleman says would have provided the following testimony:

> Because of the absence of accountability, some Trial Public Defenders spend as little time as possible preparing their cases and spend little or no time with their clients. There is no employment consequence to those Public Defenders for this conduct.
>
> The lack of independence creates problems because Public Defenders are employees of the judges, who are less interested in quality representation than in keeping things moving.
>
> ... [C]ase loads are overwhelming and create the risk that any given case does not get nearly the attention it should. Until the promulgation of Rule 24 of the Rules of Criminal Procedure, there was no caseload reduction even while defending a death penalty case. Toomey often has 50 open felony cases.
>
> The public defenders treat their private clients differently than they treat their indigent clients. This is a function of caseload. There are so many public defender cases that each one receives a little less attention than it otherwise would. Public defender cases suffer from late and often insufficient preparation.

(P–C.R. at 1388–89.) While this testimony, if true, surely indicates need for improvement in Lake County's public defender system generally,[19] there is no indication that Coleman's counsel were affected by these defi-

---

18. In all of *Cronic*'s examples, the surrounding circumstances clearly had an effect on the particular lawyer representing the particular defendant. In *Powell* the attorney was forced to proceed with a capital trial without any preparation, without ever meeting with the client or being attorney of record until the day of the trial, and without any familiarity with Alabama law or with local procedure. *See Cronic*, 466 U.S. at 660, 104 S.Ct. 2039. The citations to *Chambers, White*, and *Ex parte Hawk* all dealt with similar circumstances where the defendant was rushed to trial without giving his counsel any chance to prepare any form of defense, *see* 399 U.S. at 59, 90 S.Ct. 1975 (Harlan, J., concurring and dissenting); 324 U.S. at 764, 65 S.Ct. 978, 321 U.S. at 115–16, 64 S.Ct. 448; and *House* involved the denial of counsel altogether at a critical stage, *see* 324 U.S. at 764, 65 S.Ct. 978.

19. Two other categories of witness testimony also were proposed: competency of counsel and inadequacy of resources.' An example of the former is the statement, "Trial Public Defenders routinely failed to preserve issues for appeals," (P–C.R. at 1388), and examples of the latter included the statements "There has never been a law clerk available," "The law library materials are not current and are woefully inadequate," and "Research must be completed outside of the office by individual counsel," (P–C.R. at 1391). As for the first category, individual professional incompetence lends itself to a *Strickland*, and not a *Cronic*, analysis. As for the latter, the factors alleged are no different than circumstances faced by many solo practitioners who use resources such as the Valparaiso University School of Law library, which is approximately a thirty minute drive from the Crown Point courthouse. We fail to see how such allegations, even if true, necessitate the rare, extreme measure of circumventing *Strickland* and assuming prejudice.

ciencies. Coleman fails to produce evidence showing that *his counsel* spent as little time as possible in preparing his case, that *his counsel* were affected by being appointed by the judge, that *his counsels'* particular caseloads were so overloaded that they could not spend adequate time with Coleman's case, or that *his counsel* treated him "differently" than they treated their private clients (if they had any). In·fact, while one of his trial attorneys, Cornell Collins, stated that he stopped doing public defender work generally because his assigned workload became unmanageable, (P–C.R. at 2465), he also said this about the work he and his co-counsel did for Coleman:

> [W]e spent an inordinate amount of time working on [Coleman's case] together, separately, and away from families. And this was not a situation where we decided to do nothing, and on the day of the trial we picked a file up and went to court. We did a lot of work. And, in fact, I have no regrets. I don't know about [my co-counsel], but I have no regrets about the work we put in here in this Coleman case, because it was substantial.

(P.C.R. at 2500.)

Second, Coleman's Record of Excluded Evidence indicated that Coleman would have introduced testimony from Robert Spangenberg, president of "The Spangenberg Group" which describes itself as a "nationally recognized research and consulting firm specializing in improving justice programs." (P–C.R. at 1395.) Spangenberg's testimony was to center around a report his group had written regarding its analysis of the Lake Superior Court's public defender system between·1982 and 1992. The report concluded that the system "could not guarantee reasonably effective assistance of counsel as required under the Sixth Amendment in U.S. Supreme Court decisions." (P–C.R. at 1398–99.) Spangenberg's proposed testimony and report mention ways in which Lake County could improve its system and cites many authorities which support their recommendations, but there is no indication from the report that these alleged deficiencies affected Coleman's lawyers specifically. The blueprints contained in documents like American Bar Association Criminal Justice Standards and the National Advisory Commission on Criminal Justice Standards and Goals are very helpful in structuring public defender services, but failure to follow them is not per se a violation of the Sixth Amendment.[20]

Third, Coleman's Record of Excluded Evidence indicates that Coleman would have attempted to offer a record of testimony given by Dean Norman Lefstein of the Indiana University School of Law–Indianapolis, in a previous case challenging the Marion County public defender system. (*See* P–C.R. at 1482.) In this testimony Dean Lefstein concluded that that system "ought to be declared ... unconstitutional because of its failure to safeguard the rights of the accused." (P–C.R. at 1557.) Even if testimony about the Marion County system could be relevant to Coleman's claim, this evidence, like the rest, speaks in general terms without showing how the particular public defender system influenced the attorneys in that particular case. Indeed, Dean Lefstein acknowledged that his general view of the Marion County system did not necessarily describe how individual lawyers perform:

Q This system that we've got here in Marion County, not only theoretically but probably practically in many cases, it can provide excellent representation, can it not, for a particular criminal defendant of a particular case?

A I assume that it can.

---

20. Unlike issues involving difficult scientific or psychologic evidence, where experts are often needed to aid the finder of fact in making its determinations, Spangenberg offers his opinion on an issue that is a matter well within the expertise of judges. Whether or not an attorney could have provided constitutionally adequate assistance under the surrounding circumstances is a question readily answerable by judges, and is purely their decision to make within the parameters of appropriate law and precedent, regardless of what other legal scholars might think given a particular set of facts. While Spangenberg's analysis is useful in aiding public defender offices in revamping their procedures and policies so they might provide *better* indigent assistance, such expertise does not make the Spangenberg Group any more qualified than judges to assess whether or not a system inherently and without exception causes all lawyers operating within it to provide constitutionally inadequate assistance.

Q A lawyer could do a heck of a job for somebody, tremendous job, could he not, or she not?

A I have to assume that that's possible. (P–C.R. at 1558.)

Because Coleman's proposed evidence did not indicate that his attorneys' representation of him was affected by the alleged defects within the system, he would have lost on this claim had it been properly adjudicated on its merits below. As the Supreme Court of Illinois said: "The general allegations in this case ... do not demonstrate circumstances of either the character or magnitude that would give rise to a *per se* ineffective assistance of counsel claim." *Coleman*, 214 Ill.Dec. 212, 660 N.E.2d at 937.

## X. Appropriateness of Sentence

 Coleman argues that his death sentence was arbitrarily and capriciously imposed because the trial court found no mitigating circumstances, "although abundant mitigation was available and went unpresented." (Appellant's Br. at 149.) It is hard to see how a trial court could err in finding no mitigation to exist if such evidence is not presented to it. We also question the availability of "abundant mitigation." In Coleman's direct appeal we stated:

> We are unable to find any matters pointing toward mitigation. The psychiatric evidence was that Coleman is mentally competent; it portrays his [sic] as a manipulative sociopath of above average intelligence. He neither played a minor part in these crimes, nor acted under the domination of another, nor with the consent of the victims. In short, there is nothing apparent to detract from his culpability. Unable to see any mitigation, we are satisfied that the aggravating circumstances justify the imposition of the death penalty.

*Coleman*, 558 N.E.2d at 1065. At his post-conviction hearing, Coleman has offered additional evidence of his troubled childhood and alleged personality and brain disorders. As for the former, we have already stated that even had this evidence been introduced at trial, we do not believe that it would have made a difference in the sentencing outcome. *See supra* part III.F. As for the latter, we have already noted conflicting expert testimony regarding whether or not Coleman truly suffered from these disorders, such that he did not overcome his burden in appealing the post-conviction court's finding that no such disorders existed. *See supra* part III.F. Because of this conflicting evidence, and given the extreme gravity of the aggravators and strong evidence against him, the absence of this evidence from the trial court's sentencing determination does not undermine the reliability of Coleman's sentence.

## XI. Waiver

We decline to address each of the post-conviction court's waiver rulings. We have substantively reviewed Coleman's arguments where we deemed it appropriate. We find that Coleman's conviction and sentence were properly imposed, and his appeals were fundamentally sound.

## XII. Conclusion

We affirm the judgment of the post-conviction court.

DICKSON, SULLIVAN, SELBY and BOEHM, JJ., concur.